Syllabus.

# WILLIAM DODGE, Conservator,

## *v.*

## ALMIRON S. COLE *et al.*

*Filed at Ottawa February 3, 1881.*

1. LUNATIC—*not affected by laches or Statute of Limitations.* A confirmed lunatic or idiot can not be held accountable for any apparent negligence, *laches* or delay in seeking redress through the courts, or otherwise, for any wrong or injustice that may have been done him or her with respect to property owned by such person, nor will such person be affected by any statutes of limitation that now exist or have heretofore existed in the State, which, but for the lunacy or idiocy, would have barred his or her rights.

2. SAME—*State succeeds to the powers of the English Crown in respect to.* In theory of law the State, in its character of *parens patriæ,* may rightfully exercise the same powers and control over the persons and property of lunatics and idiots that was exercised by the Crown of England through the Lord Chancellor.

3. SAME—*application by conservator to sell his lands, is not adverse to ward—ward need not be made a party.* A proceeding by the conservator of a lunatic or insane person for an order of court to sell his land for his support, etc., is not adverse to the ward, but, on the contrary, it is for his benefit, and hence the ward is not a necessary party to the proceeding.

4. SAME—*conservator—validity of his appointment can not be questioned collaterally.* The validity of the appointment of a conservator for a lunatic, like that of an administrator, can not be attacked or questioned in a collateral proceeding, such as in a suit to set aside the sale of land by the conservator under a decree of court.

5. SAME—*jurisdiction to render decree for sale of land by a conservator presumed.* A circuit court ordering the sale of a lunatic's land by her conservator, must be presumed to have had the requisite jurisdiction, unless the contrary affirmatively appears from the record; and when the want of jurisdiction does not affirmatively appear, the decree or judgment can not be attacked collaterally for errors or irregularities in rendering the same.

6. SAME—*jurisdiction of courts of equity to order sale of lunatic's land for her support and maintenance.* At the time of the entering of a decree for the sale of the land of a lunatic, by her conservator, there was no statute which, in terms, authorized courts of chancery to entertain applications for the sale of real estate belonging to idiots or insane persons, yet it was *held,* that the court of chancery, under its general powers over the estates of infants and lunatics

or distracted persons, had jurisdiction to order the sale of a lunatic's land for her support and maintenance, on a proper application by her conservator, or to pay the conservator for moneys expended by him in supporting such ward, he having no remedy at law.

7. RESULTING TRUST—*from conversion of money by administrator into land.* Where an administrator of an estate uses the money of the estate to procure the title to lands for the benefit of the heirs of the estate, the heirs may adopt his act and claim the land, and in a suit by the conservator of one of the heirs to set aside a sale of such heir's portion of the land, the party in possession will not be allowed to set up in defence that the administrator had no right to make the investment, and that such heir's claim is only for his share of the money so invested.

8. CONSTITUTIONAL LAW—*distribution of powers of government.* The powers of government are, in their very nature, either legislative or executive. The executive powers are, in their nature, either judicial or ministerial. But, for convenience of administration, the powers of government are, by the constitution of this State, divided into three classes: legislative, executive and judicial, which is a complete disposition of the whole. From this it follows that neither branch of government to whom these powers have been thus delegated can exercise any of those conferred upon either of the others.

9. SAME—*of the judicial power.* While each department of government is, in theory, independent of the others, and must, therefore, in the first instance judge of its own powers, yet when any property right is drawn in question in a legal proceeding, depending upon an alleged usurpation of power by either of the other departments, and not with respect to a matter of which such department is made the exclusive judge, the ultimate power of determining the question belongs to the judiciary.

10. The judicial powers of the State are exercised by courts established, under the constitution, in conformity with the usages and principles of the common law, or in the manner prescribed by the legislature. They have no power to make laws, but are only permitted to declare what the law is, and apply it to existing controversies, when brought before them by some appropriate proceeding. But they have power, in the absence of legislation, to make and enforce rules of practice, and to punish for contempt; and the very fact of establishing a court, by implication, confers upon it all such powers, not expressly given, as are necessary to the efficient transaction of all such business as it is by law authorized to perform.

11. In every suit claiming a right when it is denied, it is the duty of the court to ascertain, in the first place, whether the fact or combination of facts exists upon which the right depends, and in the next place, to determine whether the law, as applicable to the facts found, gives the right claimed, and the performance of those duties is the exercise of judicial power.

Appeal from the Circuit Court of Peoria county; the Hon. J. W. Cochran, Judge, presiding.

This was a bill in chancery, brought by William M. Dodge, conservator of Maria Sharp, against Almiron S. Cole, Archibald McMasters, Charles Raymond, Thomas L. Davis, John R. Smith, Washington Cockle, William C. Henry, August Weber, Joseph Miller, Theobold Pfeifer, Jacob Rabold, Henry B. Rouse, Margaret Rouse, Horatio N. Wheeler, The Mechanics' National Bank of Peoria, William Heck, George Schmidt, Carl Wagoner, Philip Messerschmidt, John McMasters, Maurice Maroney, Samuel Seiler and Henry Kreiger, to set aside a certain sale of land made by a former conservator.

Mr. H. B. Hopkins, and Mr. Enoch P. Sloan, for the appellant:

None of the statutes of limitation which are or have been in force in this State, can have any application to this case, Maria Sharp having always been a lunatic or insane person.

The title to the property being vested in the lunatic, was not divested by the proceedings in the Peoria circuit court, under which the defendants claim title.

Maria Sharp had no notice of the proceeding to adjudge her insane, and therefore the appointment of the conservator was void, for want of jurisdiction.

The rule of law is universal, that a court is without jurisdiction, and its judgments are null and void, in all direct or collateral proceedings, when the party against whom they are rendered has received no notice, actual or constructive, of the pendency of the proceedings, and did not appear. *Buckmaster* v. *Carlin,* 3 Scam. 104; *Swiggart* v. *Harber,* 4 id. 364; *Rockwell* v. *Jones,* 21 Ill. 279; *Lawrence* v. *Lane,* 4 Gilm. 354; *White* v. *Jones,* 38 Ill. 160; *Miller* v. *Hardy,* 44 id. 448; *Campbell* v. *McCohan,* 41 id. 45; *Huls* v. *Buntin,* 47 id. 396; *Goudy* v. *Hall,* 30 id. 215; *Clark* v. *Thompson,* 47 id. 25; *Botsford* v. *O'Conner,* 57 id. 72; *Haywood* v. *Collins,* 60 id. 328; *Donlin* v. *Hettinger,* 57 id. 348; *Fell* v. *Young,* 63 id.

106 ; *Osgood* v. *Blackmore,* 59 id. 261 ; *Swearengen* v. *Gulick,* 67 id. 209 ; *Eddy* v. *People,* 15 id. 386.

The proceeding to sell the property of Maria Sharp was, upon its face, a proceeding adversary to her, and for the purpose of subjecting her property to the payment of a claim set up against her by Lisk, and she was not made a party to it, was not summoned, did not appear, no guardian *ad litem* was appointed for her, therefore she never had any day in court.

Neither the Peoria circuit court nor any other court in this State had jurisdiction or power to entertain a proceeding or make any judgment or decree for the sale of the real estate of any lunatic or insane person. We maintain that no court in this State then had power to decree a sale of the real estate of an insane person or lunatic.

Courts of chancery have no such authority by virtue of any inherent powers, or general acts concerning jurisdiction.

To show that there was no jurisdiction in the English courts, either by the prerogative warrant to the Lord Chancellor or otherwise, to decree an alienation of the lands of lunatics until the 43d year of George III, 1803, and none in this State until conferred by the act of 1853, counsel cited a great many authorities, among which are the following : *Berry* v. *Rogers,* 2 B. Mon. 308; Shelford on Lunatics, 225, marginal p. 355; *Seargeson* v. *Sealey,* 2 Atk. 412; 8 Ves. 79; *Rogers* v. *Dill,* 6 Hill. 416; *Taylor* v. *Phillips,* 2 Ves. 23; *Russell* v. *Russell,* 1 Mallony, 525; McPherson on Infants, 311; *Baker* v. *Lorillard,* 4 Com. 262; *Snowhill* v. *Snowhill,* 2 Green, Ch. 20 ; 3 Washb. on Real Prop. 197.

No rule of law is better settled in this State than that any one who is authorized to make, or whose duty it is to make, sale of property in an official capacity, in a fiduciary capacity or in the capacity of agent or trustee, can not become the purchaser of such property on his own account, whether such sale purports to be made to him directly, or is made indirectly through the intervention of a third party; and it makes no

difference whether the consideration paid be adequate or not, nor what the motive for the transaction may have been, all such sales being voidable at the instance of the party injured, if steps to avoid them be taken in a reasonable time. Directly in point are the following authorities: *Thorp et al.* v. *McCullom et al.* 1 Gilm. 614; *Sweetser et al.* v. *Skiles,* 3 id. 529; *McConnel* v. *Gibson et al.* 12 Ill. 128; *Pensonneau et al.* v. *Bleakley,* 14 id. 15; *Follansbe* v. *Kilbreth,* 17 id. 522; *Wickliffe* v. *Robinson et al.* 18 id. 545; *Robins* v. *Butler et al.* 24 id. 387; *Dennis et al.* v. *McCagg et al.* 32 id. 429; *Lockwood* v. *Mills,* 39 id. 602; *Miles et al.* v. *Wheeler et al.* 43 id. 123; *Kruse* v. *Steffins,* 47 id. 112; *Sloan* v. *Graham et al.* 85 id. 26; *Michoud et al.* v. *Girod et al.* 4 How. 503; 2 Wash. on Real Prop. 209, marginal; *Ogden* v. *Larrabee,* 57 Ill. 389; *Nelson* v. *Hayner et al.* 66 id. 493; *Demster et al.* v. *West,* 68 id. 613; *Hartz et al.* v. *Brown et al.* 77 id. 226; *Davoue* v. *Fanning,* 2 Johns. Ch. 251.

In the present case, however, no ratification of the unlawful sale is possible, or can be presumed, because the claimant is an insane person, and, as no limitation can run against her, she is yet within all the statutory limitations for real actions.

*Laches* is never imputed to idiots, lunatics and insane persons. Shelford on Lunatics, p. 404; 2 Parsons on Contracts, p. 374; Perry on Trusts, p. 782, sec. 860.

Mr. D. McCULLOCH, and Mr. R. G. INGERSOLL, for the appellees:

The title at law to the land became vested in Jane Sharp (Lisk) by the patent dated July 10, 1844, and her title was never divested until she conveyed the same by the several deeds under which the defendants claim. This was the only method by which her title could be divested.

On the 6th day of June, 1836, Sarah J. Sharp caused the purchase money to be paid at the Quincy Land Office, in pursuance of her pre-emption, and obtained a receiver's receipt. This receipt was the only evidence of title to support the bill

for partition subsequently filed.  This instrument is not nor ever was evidence of title.  Session Laws, 1827, 199; Rev. Stat. 1833, 280; Laws, 1839, 196; Rev. Stat. 1845, 232; *Rofer* v. *Claybaugh,* 3 Scam. 166; *Carson* v. *Merle,* 4 id. 363; *Aldes* v. *Abbott,* 23 Ill. 61.

The court of chancery could not, by its decree, vest title in any of the parties to that suit.  Even if the legal title had vested in Mrs. Lisk so as to countervail the effect of the patent subsequently issued, still the court had no power to divest that title without a conveyance of the land.  A judgment in a partition at law severs the joint tenancy.  A decree in chancery does not.  *Louvalle* v. *Menard,* 1 Gilm. 39; *Greenup* v. *Sewell,* 18 Ill. 53; *Tibbs* v. *Allen,* 27 id. 129; *Gregory* v. *Grover,* 19 id. 608.

The decree in chancery operated only *in personam,* and partition could only be perfected by conveyances, and this the court would order only where the parties were under no disability to convey.  *Wadhams* v. *Gay,* 73 Ill. 429; *Chickering* v. *Failes,* 29 id. 294; *Smith* v. *Crawford,* 81 id. 299; *Walker* v. *Laflin,* 26 id. 475; *Sabadie* v. *Hewitt,* 85 id. 341; *Whaley* v. *Dawson,* 2 Sch. & Lef. 371; *Penn* v. *Ld. Baltimore,* 1 Ves. Sen. 447; 2 Daniell's Ch. Pr. 1134–5; *Miller* v. *Warrington,* 1 J. & W. 493; *Youngs* v. *Cooper,* 3 Johns. Ch. 295.

The proceeding in every essential feature was in chancery, and consequently the legal title then residing in Mrs. Lisk was not divested by these proceedings.

Was Mrs. Lisk estopped, by this decree, to re-assert her title, or does she, by virtue of the decree, hold in trust for Maria?  Express trusts must be in writing.  Rev. Stat. 1833, p. 314.

No act of the husband is binding upon the wife without her acknowledgment.  Rev. Stat. 1845, chap. 34, sec. 14; *Spurck* v. *Crook,* 19 Ill. 427.

The rule is inflexible, that a married woman can not give away, or convey, or authorize the conveyance of her property, by joining with her husband or being joined with him as

plaintiff in a suit. *Spurck* v. *Crook, supra*; *Grant* v. *Schoon-oven*, 9 Paige, 255; *Reeve* v. *Dulby*, 2 Sim. & Stu. 464; *Wake* v. *Parker*, 2 Keen, 73; *England* v. *Downs*, 1 Beav. 96; *Owden* v. *Campbell*, 8 Sim. 551; *Simmons* v. *Howard*, 1 Keen, 9; *Graydon* v. *Graydon*, McM. (South Car. Eq. Rep.) 63; *Sigel* v. *Philips*, 7 Sim. 239; *Hughes* v. *Evans*, 1 Sim. & Stu. 185, n; *Pawlet* v. *Delavel*, 2 Ves, 666; *Griffith* v. *Hood*, id. 452; *Thorpe* v. *Yeates*, 1 Y. & C. Ch. 438; *Davis* v. *Prout*, 7 Beav. 288; Story's Eq. Pl. (8th ed.) p. 59, sec. 61.

She is not estopped by the decree, and the whole question of Maria Sharp's equities is open for investigation in this suit. *Wadhams* v. *Gay, supra.*

Another reason why the decree has no binding force is because Jackson Sharp was not served with process, and consequently there could be no binding decree of partition even in equity.

The partition being incomplete on these grounds, and requiring the aid of a court of equity to give it effect, the whole subject of complainant's equities is open for inquiry.

The facts do not raise a trust for the benefit of the idiot. The administrator had no lawful right to enter the land with moneys of the estate.

This unauthorized use of the money created no resulting trust in favor of the heirs, for no title to the money vests in them until the debts are paid and an order of distribution made. This was never done. *Leamon* v. *McCubbin*, 82 Ill. 263; *Neubrecht* v. *Santmeyer*, 50 id. 74; *Wisdom* v. *Becker*, 52 id. 342.

The wrongful investment of the money of a *non compos* in land creates a lien for its repayment, and nothing more, and when the lien is discharged, the title is freed from the equity. 1 Lomax on Exrs. 223; Adams Eq. 297; *Dyer* v. *Dyer*, 1 Lead. Cases Eq. (3d Am. ed.) 277; *Earl of Winchelsea* v. *Norcliffe*, 1 Vern. 435; *Awaley* v. *Awaley*, 2 id. 192; *Ashley* v. *Palmer*, Merivale, 296; *Wallace* v. *Duffield*, 2 W. & S. 529.

From this it appears that if everything Lisk did was utterly void, still appellees have a good title to this land.

A trustee, in a case like this, can convey a good title, discharged of the trust, to one having no notice.  Hill on Trustees, 278, 282.

In this case, her money, ten times over, has been restored to its proper channel by her conservator and used for her support.  That Lisk was her conservator *de facto* there is no dispute, and his appointment can not be attacked collaterally. *Wight* v. *Walbaum,* 39 Ill. 563; *Duffin* v. *Abbott,* 48 id. 18; *Osgood* v. *Blakeman,* 59 id. 261.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

This is a proceeding in chancery, commenced by appellant, against appellees, in the Peoria county circuit court, on the 20th of April, 1874, as conservator of Maria Sharp, a lunatic, which seeks to have set aside and declared fraudulent and void, divers deeds and conveyances relating to a valuable parcel of land, now constituting a part of the city of Peoria, in this State, which, it is claimed, belongs to the ward of appellant.

There was a hearing upon the merits, in the court below, resulting in a decree dismissing the complainant's bill, and the case is brought to this court by appeal.

The facts which we regard as material to a determination of the case, and which we consider substantially established by the evidence, are as follows:

In the year 1827, George Sharp purchased a squatter's claim on the fractional N. E. qr. of Sec. 17, T. 8, N. R. 8, E. 4th P. M., and settled upon it with his family, with a view of pre-empting it.  Without having done so, some four years afterwards he died, leaving his wife and children in possession of it as a residence.  Elizabeth Sharp, his widow, together with her family, continued to reside upon the premises till the 15th of December, 1834, when she died, leaving five children :. Sarah Jane, aged 22 years; Jackson, ten;

Washington, eight; Cynthia Ann, six; and Maria, four. The latter was then, and has ever since remained, a confirmed and helpless imbecile. On the 4th of May following, Lewis Bigelow was appointed administrator of her estate, in which capacity he acted till the time of his death, about two years afterwards. On November 10, 1834, Sarah Jane intermarried with John H. Lisk, and she and her husband, either in person or by tenants, continued to occupy the premises until after they were partitioned and sold, as hereinafter stated.

Subsequent to her mother's death, and previous to her intermarriage with Lisk, Sarah Jane obtained from government a pre-emption right to the fractional quarter section above mentioned, and after her marriage, to-wit: on the 6th of June, 1836, in pursuance of an arrangement between herself and the administrator, the latter purchased it from the United States in her name, and paid for it out of moneys then in his hands as administrator of her mother's estate. The amount paid for the land was $189.46¼, being $1.25 per acre. The register and receiver of the Land Office, respectively, issued to her at the time, by the name of Sarah S. Sharp, the usual certificates of payment and entry.

Although the entry was made in her name, it was understood and intended, at the time, for the benefit of the other four children, equally with herself, and, with a view of protecting their interests, she, at the time of the entry or immediately thereafter, entered into a written stipulation to equally partition the land between them and herself. In pursuance of this agreement, at the July special term, 1839, of the Peoria circuit court, the land in question was, by the decree of the court, upon the petition of herself and husband, equally divided between her and the other four children. The partition proceedings appear regular, except that it does not affirmatively appear there was service on Jackson. All parties seemed to be satisfied with the division of the land, so far as the record shows, and the validity of the proceedings does not appear to have ever been questioned till the com-

mencement of the present suit. The petition shows, upon its face, the circumstances under which the entry of the land was made by the administrator, so that the equities of the other children were made to fully appear in that proceeding. After these partition proceedings, to-wit: on the 10th of July, 1844, a patent was issued to Mrs. Lisk, by the name of *Sarah S. Sharp*, the name in which the entry was made. On the 29th of April, 1847, John H. Lisk and his family, including the said Maria, were then residents of DeWitt county, this State, and on that day the said Maria, upon Lisk's petition, without service on her, was adjudged, by the circuit court of that county, an insane person, and he, at the same time, was appointed her conservator. Previous to his appointment as conservator, to-wit: on the 14th of March, 1837, he had been appointed, by the probate court of Peoria county, her guardian, and was still acting in that capacity. On the 27th of May, 1847, Lisk, in his capacity of conservator, presented an *ex parte* petition to the circuit court of Peoria county, being still a resident of DeWitt county—setting forth that his ward was the owner of certain real estate in Peoria county,—being in part the same allotted to her in the partition proceeding,—that it was unproductive, and asking a decree to sell the same for her maintenance. On the 4th of June a decree was rendered in accordance with the prayer of the petitioner; and, in pursuance thereof, on the 14th of August following, the premises were sold by Lisk at public sale, and, by an arrangement between him and one Hamlin, they were bid off by the latter at the sum of $700, which was about their value at that time. Hamilton paid nothing for the premises, and on the same day, without consideration, reconveyed them to Lisk. A report of this sale was approved by the court on the 21st of October, following.

The sale of Maria's land by order of the court, as just stated, included her interest in Jackson's part of the land, he having previously died, in 1843, intestate, without any children, or descendants of children, or wife.

On the 28th of April, 1848, Lisk, as conservator, made a report to the circuit court of DeWitt county, showing the sale of his ward's lands in Peoria county and the receipt by him of the $700 realized from the sale, and also that his ward was indebted to him for support, payment of taxes, etc., in the sum of $1400, or thereabouts, and asking that the proceeds of the land be applied to the payment of his claim, and it was so ordered by the court.

At the December term, 1872, of the DeWitt circuit court, Lisk made a final report, showing that all moneys and effects belonging to his ward were exhausted, and at his own request, was, by order of the court, discharged from the office and trust of conservator.

At the following August term of the same court, upon the petition of George W. Funk, a relative of the said Maria, William M. Dodge, the appellant, was appointed her conservator instead of Lisk, and the present suit is brought by him as such conservator. Appellees respectively claim title to separate and distinct parcels of the lot of ground assigned to Maria under the partition proceeding, and also that which she inherited from her brother Jackson, through conveyances made by Lisk and his wife more than twenty years before the commencement of this suit.

In addition to the proceeds of this land, Lisk, as conservator, received, on account of his ward, $105, her distributive share of her mother's estate. Maria, from the time of their intermarriage, in 1834, up to the present time, has been supported and cared for exclusively by Lisk and his wife, covering a period of some forty years or more, at the time of the commencement of this suit, during all which time she has not had mind sufficient to feed herself without assistance, and the only compensation they have ever received therefor, so far as the record shows, is the proceeds of this land and the $105 above mentioned.

Under these circumstances, nothing but an imperative sense of duty would incline us to disturb the titles of valuable

estates, based upon legal proceedings which occurred so many years ago, and which the proofs abundantly show were conducted in the best of faith.

The theory of appellant is, that the appointment of Lisk as conservator, and the sale, by him, of his ward's land, was absolutely null and void, and that, by reason of her idiocy, the statutes of limitation have not run against her, and that her title, being a matter of record appearing upon the face of the partition proceedings to which Lisk and his wife were parties, all persons claiming by or through them, either immediately or remotely, are chargeable with notice of her rights, and must be regarded, according to a well recognized principle in equity, as holding the property in trust for her. If the assumption of appellant is justified by the facts, we see no means of escaping the conclusion reached.

In the view we take of the case, it will be necessary to consider but few of the numerous questions which have been so elaborately discussed by counsel.

Whatever is in the case on either side, it is believed, has been, through the industry, research and legal ability of counsel, developed and presented in its most favorable light to their respective clients, thus furnishing us, without labor on our part, with all the available material that can possibly be obtained to aid us in reaching a conclusion with respect to the mutual rights of the parties before us.

It is clear, from the proofs in this case, that Maria Sharp, from a period anterior to the purchase of the land in controversy from the government, to the time of commencing this suit, has been a confirmed lunatic, and can not therefore be held accountable for any apparent negligence, *laches* or delay in seeking redress through the courts, or otherwise, for any wrong or injustice that may have been done her with respect to the property in question. Nor is she at all affected by any of the various statutes of limitations that now, or have heretofore existed in this State, which, but for her lunacy, would have barred the present proceeding; and this we understand to be,

in effect, admitted by appellees. The validity, therefore, of the partition proceedings, the appointment of Lisk as conservator, the sale of the land by him, under the decree of the Peoria circuit court, and of all other matters of a like character, must be regarded, so far as she is concerned, as unaffected by lapse of time, or the Statute of Limitations.

It is claimed by appellees, that by reason of Maria Sharp being a lunatic, it was not within the power of the administrator to convert the money which belonged to her, as distributee of her mother's estate, into land; and that its appropriation by him for that purpose simply gave her a lien upon the land for the money thus appropriated; that as the law forbids such conversion, whatever interest she acquired in the land must be regarded as personal estate, and a number of authorities are cited in support of the position. If she were dead, and this was a controversy between her heirs and personal representatives as to which should take her interest in the land, quite a different question would be presented. But we are of opinion the principle contended for and announced in the cases cited have no application to the circumstances of this case. If her money was invested in land, though improperly, the conversion nevertheless became effectual and irrevocable as to all persons, or except those having some legal interest in the money converted. Neither the appellees nor any one else are seeking in this proceeding to recover the money thus invested or to reach any portion of her personal estate.

We are, therefore, clearly of opinion, that whatever might be the rule under different circumstances, the principle contended for has no application to the facts of this case.

The real and vital point in this case seems to turn upon the validity of the sale by the conservator, of Maria's interest in the land, under the decree of the Peoria circuit court. For, whatever might be the views of the court upon all other questions involved in the controversy, if this one should be determined against appellant, it would be fatal to the present

proceeding. On the other hand, if the Peoria circuit court had no jurisdiction or authority to order the sale, and the whole proceeding, including the sale, was a mere nullity, it is difficult to avoid the conclusion that appellant is entitled to recover. We shall, therefore, proceed at once to the consideration of that question.

It is claimed, in the first place, that the proceedings in the DeWitt circuit court, in which Maria Sharp was adjudged an insane person and John H. Lisk was appointed her conservator, are null and void, for the reason it does not appear that there was personal service on her, and that therefore Lisk had no right or authority, as conservator, to make application for a sale of the land, or to sell the same under the directions of the court; that his appointment being void, his action in the premises must be regarded as that of a mere stranger, and in support of this position *Eddy* v. *The People ex rel. etc.* 15 Ill. 386, is cited and relied on. It is sufficient to say, with respect to this question, that we are of opinion that the validity of Lisk's appointment as conservator can not be inquired into in a collateral proceeding like the present. It is the settled doctrine of this court, that the regularity or validity of an administrator's appointment can not be questioned collaterally, ( *Wight* v. *Wallbaum*, 39 Ill. 563, *Duffin* v. *Abbott*, 48 id. 18,) and on principle we can see no difference in the case of a conservator and an administrator. The appointment was made more than forty years ago, and from thence until a short time before the bringing of this suit, Lisk was faithfully discharging the duties of the trust without his authority to act being questioned by any one, and now for the first time, in a mere collateral proceeding, it is sought to go into an inquiry as to the regularity and propriety of his appointment.

It is further claimed, that at the time of the rendition of the decree by the circuit court of Peoria county authorizing a sale of the land, there was no law in existence in this State conferring upon circuit courts power to order a sale of the

land of an idiot or insane person. If this position be true, it necessarily follows the whole proceedings in that court, and the sale under it by the conservator, were a nullity, and all persons claiming title through such proceedings and sale are chargeable with notice of that fact, for every one is conclusively presumed to know, when purchasing an estate, the legal effect of every judgment or decree through which he deraigns title.

It is conceded that at the time of these proceedings there was no statute which, in terms, authorized courts of chancery to entertain applications for the sale of real estate belonging to an idiot or insane person. The statute then in force gave the conservator " the entire care of the estate," " both real and personal," of an " idiot, lunatic or distracted person," and authorized him to sue and be sued in his capacity of conservator, and also provided that executions issued against him as conservator might be levied upon any property in his possession, whether real or personal, belonging to his ward, not exempt from execution, and that the same might be sold as in other cases. It also authorized him to sell and dispose of the personal estate of his ward without any order of the court for that purpose, but no such power was conferred upon him with respect to the real estate. The act also provided that the conservator should be allowed reasonable compensation for his services, yet it was silent as to how he was to be paid where the estate of his ward consisted solely, as in this case, of unproductive real estate. Revised Laws of 1833, p. 332.

The statute in force at that time in relation to the poor of the county, like our present statute, made no provision for any one who had property of his own. So, if the position of appellant is correct, it follows that an idiot or insane person at that time, if his conservator were unable to obtain credit, might, with an unproductive estate in lands worth $100,000 or more, have starved to death, while neither the State nor his relations would have been under any obligations to provide

for him, simply because there was no power in the courts to order a sale of his lands. If such was the law at the time of those proceedings, it must be confessed it was extremely defective, and it is difficult to conceive how a court, whose jurisdiction is founded mainly upon necessity and the general principle that it will afford relief where there is no adequate remedy at law, would be impotent to afford relief under such circumstances. We can not yield our assent to this view of the matter.

The legislature, in providing the conservator should have reasonable compensation for his services, must have intended the appropriate courts should be open to him where it could not be otherwise enforced. Other creditors, where there was no personal estate, were authorized, under the provisions of the statute, to go into a court of law, obtain judgments against the conservator, sue out executions, and cause the real estate of the ward in the conservator's possession to be sold in satisfaction of their judgments. But the statute afforded him no such remedy. He could not, of course, sue himself, as conservator, nor could he sue his ward in a court of law; so, in such case, all creditors would have a remedy except the conservator, unless he were permitted to go into a court of equity for relief, and the only relief that court could afford would be to order a sale of so much of the land as would be necessary to pay his demand.

The law, upon the appointment of the conservator, confers upon him certain powers, and imposes certain duties, which the statute, in express terms, denominates a trust. The relation of trustee and *cestui que trust* is at once created between him and his ward. The estate of the latter becomes a trust fund for his own support and that of his family, if he has one, and, like any other trust fund, it is subject to the control and direction of a court of equity.

The argument by which the conclusion is reached, that a court of chancery had no power to order the sale in question, is, in general terms, as we understand it, substantially this:

23—97 ILL.

That by the common law of England, as it existed prior to the fourth year of the reign of James the First, the power and control over the persons and property of lunatics and idiots belonged to the king, as *parens patriæ,* and were exercised by him through the Lord. Chancellor. That although this jurisdiction was exercised by the Lord Chancellor in the High Court of Chancery, yet it was not exercised by him in his character of Chancellor, or by virtue of the general powers pertaining to that court, but, on the contrary, by virtue of a separate and distinct commission under the sign manual from the crown. That upon the organization of our State government the State, as a political sovereignty, in its character of *parens patriæ,* succeeded to all the rights and duties previously enjoyed or exercised by the Crown of England with respect to idiots and lunatics and their estates. That the power to which the State thus succeeded is not of a judicial character, wherefore, in the distribution of the powers of government under the constitution, it was not thereby delegated to or conferred upon the judicial department of government, and hence, without express legislation, a court of chancery was not authorized to exercise it. That this view has much force in it can not be denied.

It is conceded that the power exercised by the Lord Chancellor of England, over the persons and estates of lunatics and idiots, was, in early times, when the jurisdiction of the High Court of Chancery was very limited, conferred upon him by special grant from the crown, and was not, except, perhaps, to a limited extent, referable to the general powers exercised by him in his character of Chancellor. We also understand, that in theory of law, the State, in its character of *parens patriæ,* may rightfully exercise the same power and control over the persons and property of lunatics and idiots, that was exercised by the Crown of England through the Lord Chancellor, at the period referred to. We further understand, that under the constitution of 1818, and the statutes in force at the time of the sale in question, the circuit

courts of this State possessed original jurisdiction in all mat-
ters    *    *    *    in chancery, as the same had been previously
exercised and understood in the courts of this country and
England, having general chancery powers, and that they pos-
sessed no other or further powers or jurisdiction.

And it must also be confessed, that the decided weight of
authority establishes the proposition, that a court of chancery
has no inherent power to decree a sale of lands belonging to
lunatics, idiots, infants, or others laboring under disabilities.

Leaving out of view the effect of the statute relating to
idiots and insane persons, already alluded to, it follows that
if the sale in question can be sustained at all, it must be upon
general and fundamental principles which have not heretofore
received full recognition by courts of equity in determining
their power to order such sales, and this will lead us to consider,
briefly, the general features of our State government, so far as
they may be supposed to have any bearing upon this question.

All political powers which the State may rightfully exer-
cise at all, belong, ultimately, to the people, in their sover-
eign corporate capacity, which they may distribute for
purposes of government, in such manner as they think best,
subject to the limitation, that when the State government
is organized it shall be republican in form.   These powers of
government are, in their very nature, either legislative or
executive.   Every legitimate exercise of political power, of
necessity, consists in the making or execution of some law.
The executive powers are, in their nature, either judicial or
ministerial; hence, for convenience of administration, the
powers of government are, by the constitution of this State,
and that of all the others, so far as we are advised, divided
into three classes, namely: legislative, executive and judicial;
and, by this division, are conferred respectively upon three
distinct branches of the government, and this being a com-
plete disposition of the whole, it follows, neither branch of
government to whom these powers have been thus delegated,
can exercise any of those conferred upon either of the others.
While each department is, in theory, independent of the

others, and must, therefore, in the first instance, judge of its own powers within the grant, yet, whenever any property right is drawn in question, in a legal proceeding depending upon an alleged usurpation of power by either of the other departments, and not with respect to a matter of which such department is made the exclusive judge, the ultimate power of determining the question belongs to the judiciary. It is the right of the legislature to pass general laws for the government and regulation of all persons and property within the State, and it is made the exclusive judge of their fitness and propriety, so long as they do not encroach upon the powers entrusted to the other departments of the government, or interfere with vested rights.

The legislature has the power, should it deem it expedient, to repeal all laws not embodied in the constitution, except such as are essential to the enforcement of vested rights, and, subject to the same limitation, it may change the forms of action and modes of procedure in courts of justice to whatever extent it may see fit.

The judicial powers of the State are exercised by courts established under the constitution, in conformity with the usage and principles of the common law, or in the manner prescribed by the legislature.

When set in motion by the institution of suits for the settlement of difficulties, it is the province of courts to declare what the law is, and apply it to the controversies before them. They have no power to make law. That is a legislative function, which must be exercised exclusively by the legislative branch of the government. They are only permitted to declare what the law is, and apply it to existing controversies, when brought before them by some appropriate proceeding.

These general propositions are plain, simple and well understood by all who have even a limited knowledge of the organic law of the State.

Nevertheless, when we come to apply them to actual controversies, growing out of the varied relations which the citizens sustain to the State and to one another, we encounter doubts and difficulties of the gravest character.

Just where the dividing line is to be drawn between judicial and legislative power, with respect to certain subjects, often presents questions about which enlightened courts and eminent jurists widely differ.

So, while the powers of courts seem so very simple and clearly defined, yet, in the application of them to actual cases, their proper limits are often difficult to determine. And the difficulty in this respect is not a little enhanced by the fact, the same constitution by which the distribution of the powers of government is made, provides for a specific class of courts by name, which have, from time immemorial, had a definite mode of procedure, and exercised many powers which, if determined by the constitutional test, as founded on the simple distribution of the powers of government, could hardly be regarded as strictly judicial, and it is reasonable to suppose that the people, in providing, through the organic law of the State, for these courts, intended to establish them with all the powers which had theretofore been exercised by those courts. As an illustration, where the legislature has not otherwise provided, all courts of record and of general jurisdiction, may prescribe such reasonable rules as may be necessary for the efficient transaction of their business, and parties litigant and counsel are bound by them. Nevertheless, the power thus exercised in the adopting of such rules, is clearly, in its nature, legislative, and not judicial. Moreover, much that is done by the judges who preside over these courts is purely of a ministerial character, yet absolutely essential to the transaction of the business of the courts. So, much of their procedure and many of their powers are of common law origin. On this principle, courts, without any legislation for that purpose, are understood to have an inherent power to cause to be brought before them and pun-

ished all persons who unlawfully obstruct their process during term time.

The very act of establishing a court, by implication confers upon it such powers, not expressly given, as are necessary to the efficient transaction of all such business as it is by law authorized to perform.

The primary object of every enlightened government is the protection of the persons and property of its citizens; and of all the agencies usually provided for the accomplishment of this object, the courts are confessedly the most efficient.

The State, upon its organization, assumes the duty of providing for the peace, health, security and common welfare of all who owe it allegiance, and it especially undertakes to provide for and protect those who are, in fact or in contemplation of law, unable to take care of themselves; and this is accomplished, to a large degree, through its courts. Through their coercive powers property is protected from the assaults of force, fraud and dishonesty, and through their administration is made to supply the wants and relieve the necessities of the weak and helpless, and to accomplish these ends is the primary object in establishing them. Courts of chancery deal with property rights almost exclusively.

Indeed, it has been said by high authority, that they are powerless to act in any case where the rights of property are not in some manner involved, though this is denied by others. However this may be, it is undeniable that the business of courts of equity is almost, if not entirely, confined to adjusting difficulties and controversies with respect to property, and to administering it for the benefit of those who are not permitted by the law, or have not mind sufficient, to act for themselves.

In short, courts of equity have to deal with, declare and enforce property rights. They have no power to create them. Their business is simply to declare and enforce them as they find them, through the modes of procedure which the law has provided. Every right to be thus declared and enforced by a

court of equity springs from the law by reason of the existence of some fact or facts, or combination of facts.    Therefore, in every suit of the kind, it is the duty of the court, where it is denied, to ascertain, in the first place, whether the fact or combination of facts upon which the right depends, exists; and in the second place, to determine whether the law, as applicable to the facts found, gives the right claimed; and the performance of these duties, on the part of the court, is the exercise of judicial power.

Now, inasmuch as the primary object of all property rights is to provide the owner with means to relieve his wants and necessities, and to administer to his comfort, convenience and well-being, the law wisely gives to every adult person, not laboring under disabilities, the unlimited right to dispose of whatever belongs to him in such manner and for such purposes as he may deem most conducive to the object in question, and there is no difference, in this respect, between personal and real estate.    And, inasmuch as infants are presumed by law to be incapable of contracting, and therefore are not permitted to sell or otherwise dispose of their estates, except to a limited extent, courts of equity have, from time immemorial, upon proper application, assumed jurisdiction over their persons, their personal estate, and the rents and profits of their lands, and applied the same to their support and education, and this without any special statute authorizing them to do so.    And in the same manner the Lord Chancellor in England, as we have already seen, by virtue of a special commission from the Crown, applied the personal estate and the profits of the real estate of lunatics and idiots to their support and maintenance.    Upon what principle may it be said, then, that a court of equity has an inherent right to order a sale of the personal estate of an infant for his support, and yet have no such inherent power to dispose of his lands for the same purpose?    It is not a sufficient answer to say, because one is personal property and the other is real property.    The right to own property at all, as we have just

seen, implies the right to have it applied to one's support, and there is no difference in this respect between land and personal estate, or whether the owner is an infant or an idiot, or an adult free from disabilities.

Inasmuch as the jurisdiction of courts of equity, in disposing of the personal estate of infants for their support, does not depend upon any statutory provisions, but upon. general principles, it is important to ascertain as definitely as we can the true reasons upon which the jurisdiction rests, and also to discover, if possible, the grounds upon which they have hitherto declined to assume jurisdiction, when the application has been to sell realty for the same purpose.

So far as this country is concerned, the mere difference between the two kinds of property can not reasonably be regarded as an element in the question. It is believed the true and only rational grounds upon which the jurisdiction rests, are: 1. The duty of the State to protect and provide for such of its citizens as are incapable of taking care of themselves. 2. The right of every owner of property to have it applied to his support. 3. The absolute necessity for such relief. 4. Such applications involve the exercise of judicial power. 5. The duty which the State owes to those laboring under disabilities can be more appropriately and efficiently performed through courts of equity than in any other way.

Since all of these reasons apply with equal force to applications for the sale of real property, the natural inquiry arises, why is it held the jurisdiction does not extend to real property? Doubtless, for two reasons:

1. The jurisdiction originated in England, at a time when it was contrary to the settled policy of that country to interrupt the course of descents to real property. The law of primogeniture was then in full vigor, and was regarded with great favor by the courts, and of course every severance of an estate necessarily interrupted the course of descent, and was justly regarded as antagonistic to the much cherished right of primogeniture. It was the pride of the English

people to keep their large and valuable landed estates intact, so that they might descend from generation to generation in the same family. Moreover, the lands there were almost universally productive, so that the income, as a general rule, was all that was necessary for the support of those laboring under disabilities, hence there was no necessity for the sale of the realty. The policy of this country is the very reverse of that which gave rise to the rule in England. With us it has been the settled policy to keep our lands unfettered by entailments, and to encourage, as far as possible, their free and untrammeled transfer from one to another.

2. The recognition, in this country, of the rule which permits courts of chancery to order a sale of the personal estate, but not of the realty, of persons laboring under disabilities, is attributable solely to the great veneration in which previous decisions are held by the courts. As a general rule, a court follows the old beaten track of precedents, without ever stopping to inquire into the reasons upon which they rest, until it discovers that to follow it in some particular case will result in great hardship or manifest injustice, when, for the first time, it feels itself bound to reconsider the reasons upon which the precedents it has hitherto followed rest, and upon such reconsideration it may find that the grounds upon which the original case was decided are not sound, and that all the subsequent cases have simply followed it without examining the reasons upon which it rests, or it may turn out that the reasons upon which the original case was decided have ceased to exist. In either of the cases supposed, where the case has not become a rule of property, the court should disregard the precedents, and announce such a rule as is consonant with reason and justice.

The value of every case as a precedent, which is not founded upon some statutory provision and has not become a rule of property, depends entirely upon the reasons which support it. If it is founded upon a misapprehension of facts, or is supported by false logic, or the reasons upon which it

rests have ceased to exist, and the case has not become a rule of property, it should be disapproved, and no longer be recognized as authoritative.

On the other hand, where a question has once been solemnly decided by a respectable court of last resort, the decision of such court should, unless some of the reasons we have mentioned, or others equally good, affirmatively appear to the contrary, be accepted as the best evidence as to what the law is on that question, and courts should give it effect accordingly, or, in other words, should adhere to the principle of *stare decisis.*

The general rule unquestionably is, all cases falling within the same principle, however much they may differ in their facts as to unimportant matters, should be decided in the same way. In our judgment, in this country, where it is the settled policy, as we have seen, to encourage the free transfer of real property to the same extent as that of personal estate, there is no more reason for holding that a court of equity has an inherent power to order the sale of the one and not the other, than there would be to attempt to found a distinction with respect to the power of the court to order a sale on the difference between a flock of sheep and a herd of cattle.

If courts of equity have the power, without legislation, to order the sale of the one, they have power to order the sale of the other, and since there is no question as to their power, with respect to the sale of the personal estate of an infant, we hold, for the reasons already stated, they may, in like manner, direct the sale of the real estate of an infant, lunatic, or idiot, whenever necessary for his support. All the reasons which we have mentioned as the grounds of the jurisdiction of a court of equity to order a sale of the personal estate of an infant, apply with more force, if possible, to the case of a lunatic or idiot.

An inquiry, for the purpose of determining whether there is a necessity for converting the real estate of a lunatic into money for his support in a particular case, is clearly the

exercise of judicial power, and, since the primary object of all
property rights is to provide the owner with means to relieve
his wants and necessities, and, since every such owner there-
fore has the right to have his property applied for these pur-
poses, and inasmuch as lunatics are unable to do this for
themselves, and it is the peculiar province of courts of equity
to enforce existing rights, when the the law affords no ade-
quate remedy, as it certainly does not in cases of this character,
it is not perceived, on principle, why courts of equity may
not well assume jurisdiction in such cases; and it is hardly a
sufficient answer to say the precedents are the other way, if
well established principles sanction the jurisdiction.

It is conceded that if there was not an existing right in the
lunatic to have his property applied for his support, then a
court of equity would have no power or authority to inter-
pose, for to do so would be an invasion of the rights of the
legislature, or, in other words, it would be simply judicial
legislation.

At the time of the application for an order for the sale of
the land in controversy, there was no Lord Chancellor com-
missioned by the State with the power to provide for the
wants and necessities of all lunatics and idiots within the
State, nor was there any other tribunal, save a court of equity,
authorized to act in the premises.

Moreover, it must be borne in mind, that when this diver-
sity in the jurisdiction exercised over infants and persons of
unsound mind first obtained, courts of chancery were then in
their infancy, and the principles upon which they acted were
not so well defined and understood as they are now.  At that
time, their jurisdiction was confined in very narrow limits
and was extended to comparatively but few subjects, and to
hold that all matters over which they did not then assume
jurisdiction is a sufficient reason for withholding equitable
relief at the present time would be to deprive courts of equity
of the greater portion of their jurisdiction.  This we are not
prepared to do.  All who are conversant with the history of

equity jurisprudence know that as a distinct system, it has been of constant growth and development from its inception to the present time, covering a period of hundreds of years. The jurisdiction of a court of equity does not depend upon the mere accident whether the court has, in some previous case or at some distant period of time, granted relief under similar circumstances, but rather upon the necessities of mankind, and the great principles of natural justice, which are recognized by the courts as a part of the law of the land, and which are applicable alike to all conditions of society, all ages, and all people. Precedents are useful as evidences of what the law is, and serve as guides in the application of those principles. Where it is clear the circumstances of the case in hand require an application of those principles, the fact that no precedent can be found in which relief has been granted under a similar state of facts is no reason for refusing it. *Curtiss* v. *Brown*, 29 Ill. 201; *Voris* v. *Sloan*, 68 id. 588.

It is not true, however, in point of fact, that courts of equity have never exercised jurisdiction over the persons and estates of lunatics and idiots. *Ex parte Salisbury*, 3 J. C. R. 347.

It is further claimed by appellant, that the proceeding by the conservator to sell the land was adversary to his ward, and therefore the ward should have been made a party, and that not having been done, the court was without jurisdiction to render any decree in the case. We do not regard the proceeding as adverse to the ward, but, on the contrary, for her benefit.

The petition prayed for a sale of the premises for the payment of existing indebtedness on account of her support and for her future maintenance, and, so far as its object was to provide means for her future support, it was clearly for her benefit, and it was not, therefore, necessary to make her a party.

The allegations in the petition were sufficient to give the court jurisdiction, and the decree must, therefore, be regarded

as binding in all collateral proceedings, and its effect in this respect can not be changed, even admitting the proceeds of the sale were applied to an improper purpose, which we do not wish to be understood as at all intimating was done. This substantially disposes of the main objections against the validity of the decree, and sale by the conservator, and the conclusion reached, of course, renders it unnecessary to consider other questions which have been argued by counsel.

For the reasons stated, we are of opinion the decree of the circuit court should be affirmed, and it is, therefore, so ordered.

*Decree affirmed.*