THOMAS E. FRUITT, Administrator, etc.,

v.

ELIZABETH ANDERSON, Conservatrix, etc.

</div>

<div align="right">12 421<br>155s 332</div>

1. EVIDENCE.—Where a suit was prosecuted against a conservatrix of a lunatic, and a party, were he alive, would be wholly disqualified to testify as a witness for the purpose of establishing the cause of action at issue, the statements of such interested party made while alive, are not admissible to make out such cause of action.

2. PRESUMPTION FROM MEMBERS OF SAME FAMILY LIVING TOGETHER AS ONE HOUSEHOLD.—The law will not, in the absence of special circumstances, imply either an intention to charge or a promise to pay for board or services among members of the same family living together as one household. In such cases, the presumption naturally arises from the very fact of the relationship that it was intended as a gratuity. To rebut the presumption, ordinarily either an express contract must be proven or it must be shown by facts and circumstances that at the time the board was furnished or services rendered, the one expected to receive payment and the other to make payment.

3. PARENT AND CHILD.—From the evidence in this case, the court is of opinion that prior to 1876, the care bestowed upon the adult insane son was intended as a gratuity by the father, and therefore his administrator can not recover for such expenditures. But the change in the father's circumstances, in 1876, added to the fact that then for the first time, the father learned that his son was entitled to a pension, and made application and was appointed his conservator and applied for a pension for his son, show that it was the intention and right of the father to charge his son for necessaries to be furnished him. The *quasi* liability under the Pauper Act, and from the moral obligation of a father to support a helpless son, ceased when it was ascertained that the son was possessed of a claim for accrued and future pension money.

4. IMPLIED CONTRACT FOR NECESSARIES BINDING ON AN INSANE PERSON.—The contract of an insane person for necessaries supplied to him in

good faith may be enforced, and it is not necessary to prove a specific agreement because the law raises a contract by implication on the part of the insane person by virtue of which the amount of such necessaries becomes payable as a debt.

5. PRESUMPTIONS OF LAW.—A promise may be imperatively and conclusively presumed by law from the existing relations between the parties, and sometimes a jury may infer a request or promise even contrary to the fact on the ground of legal obligation alone. The law will imply for an insane person no promise that is not reasonable and just. It is, however, pre-eminently just that pension money should be applied at least in part to the object for which it was intended and in payment for the necessaries of life furnished a lunatic pensioner by one, who at the time they were furnished, expected to receive compensation when the pension money should be collected.

6. PRACTICE—WHAT IS IMPLIED BY THE TERM CAUSE OF ACTION.—The proper remedy of a creditor of one who is adjudged to be insane, is by suit against the conservator as his representative. The term, cause of action, implies not only a right of action, but also that there is some person in existence who is qualified to institute process. The right must be capable of being legally enforced, and there must also be a person to be sued.

7. STATUTE OF LIMITATIONS.—A man can not be both plaintiff and defendant in a suit at law. Where a party could not institute suit against himself as conservator for a lunatic for necessaries furnished by him to the lunatic, the Statute of Limitations does not apply, and will create no bar to the recovery of the claim.

ERROR to the Circuit Court of Madison county; the Hon. WILLIAM H. SNYDER, Judge, presiding. Opinion filed April 13, 1883.

Messrs. IRWIN & SPRINGER, for plaintiff in error; that in an action of assumpsit, the promise may be imperatively and conclusively presumed by law from the existing relations proved between the parties, cited Greenl. on Evidence, §§ 102, 108.

Generally it is sufficient if the money is paid, or service rendered for a reasonable cause and not officiously: 2 Greenl. on Evidence, § 108; Bailey v. Busing, 28 Conn. 463.

The minor who is released from his father's service, stands as to his contracts for labor either with strangers or with him, upon the same footing as if he had arrived at full age : Schouler on Domestic Relations, 371; Nightingale v. Whitington, 15 Mass. 272; Corey v. Corey, 19 Pick. 29; Var-

ney v. Young, 11 Vt. 258; Johnson v. Gibson, 4 Smith, 231; Steel v. Steel, 12 Penn. 64; Hall v. Hall, 44 N. H. 293.

The Pauper Act does not relieve the pauper from his obligation to make compensation for his support: Mercer v. Jackson, 54 Ill. 397.

An insane person having property adequate to his support is not a pauper, and the county is not liable for such person's support: Alton v. County, 21 Ill. 115.

The estates of insane persons become a trust fund for their support, and like any other trust fund, subject to the direction and control of a court of equity: Dodge v. Cole, 97 Ill. 338; 2 Story on Equity Jurisprudence, § 1365, b; Perry on Trusts, § 615; Lee v. Brown, 4 Ves. 396; Bond v. Lockwood, 33 Ill. 212.

The Statute of Limitations did not begin to run until the trust relation of Anderson to John ceased, and a settlement of accounts between them was required: Angell on Limitations, Chap. 7; Spencer v. Spencer, 4 Md. 368.

Messrs. HAPPY & TRAVOUS, for defendant in error; that the obligation on the part of the parent to maintain the child, continues until the latter is in a condition to provide for its own maintenance, cited 2 Kent's Com. 190; Hunt v. Thompson, 3 Scam. 179; R. S. 1881, Chap. 107.

The law will not imply a promise to pay for support and maintenance on the part of parent or child from a simple residence in the family. An express promise is necessary: Liddell v. Hastings, 11 Rep. 305; Wilcox v. Wilcox, 48 Barb. 327; Williams v. Hutchinson, 5 Barb. 124; Dye v. Kerr, 15 Barb. 444; Vankuren v. Saxton, 3 Hun, 547; Myers v. Malcom, 20 Ill. 621; Robinson v. Cushman, 2 Denio, 149; In re Kelley's Estate, 1 Tucker, 28.

Where children remain with parents after attaining majority, the presumption is that they remain on same terms previously existing between them : Miller v. Miller, 16 Ill. 296; Freeman v. Freeman, 65 Ill. 106; Byers v. Thompson, 66 Ill. 421; Morton v. Rainey, 82 Ill. 215; Guffin v. First Nat. Bank, 74 Ill. 259; Trumble v. Dodd, 2 Tenn. 500; Ex parte

Bond, 2 M. & K. 439; Presley v. Davis, 7 Rich. 105; Matter of Kane, 2 Barb. 375.

The personal representative can not prefer a claim against child for past support where parent in his lifetime had not done so: Dupont v. Johnson, 1 Bailey Eq. 277; Griffith v. Bird, 22 Gratt. 73.

All alleged indebtedness which had accrued five years prior to the commencement of this suit is barred by the Statute of Limitation: R. S. Chap. 83, § 15; Reeves v. Herr, 59 Ill. 81; Schillo v. McEwen, 90 Ill. 77; Phœbe v. Jay, Breese, 207; Hubbard v. Stearns, 86 Ill. 35.

BAKER, P. J.   A point is made that the circuit court erred in excluding testimony offered by plaintiff in error, of statements made by his intestate at various times during the latter years of his life to sundry of his neighbors and creditors with regard to his claim against his insane son. It is very clear such testimony is not competent, and the action of the court complained of was right. The suit is prosecuted against defendant in error as conservatrix of a lunatic, and the intestate, were he alive, would be wholly disqualified to testify as a witness for the purpose of establishing the cause of action at issue; and it is not perceived upon what theory, now that he is dead, mere statements made by him while alive and an interested party and not under oath, can be held proper evidence to make out such cause of action.

John Anderson was emancipated by his father in the spring of 1862, and in November of that year he arrived at the full age of twenty-one years. At the time he became insane, in June, 1863, at Fort Pickens, he had the right to his own wages, the disposal of his own time and the control of his own person, at least so far as regards parental authority. Soon afterward he was brought back to his father's house hopelessly insane; and he was supported and maintained, and supplied with all the necessaries, by the father, for a period of about seventeen and a half years, and until the date of the father's death, in December, 1880. The proofs show it was worth at least $50 a month during all that period to provide

him with food, clothing, lodging and necessary attendance. Under the circumstances disclosed by the record, can the administrator of the father recover in this action of assumpsit against the conservatrix of the son for these necessaries so furnished?

The important inquiry arises whether or not the intestate, at the time he opened the doors of a father's house and home to receive his unfortunate son and undertook the burden of his future support, or at any time during the many years he provided him with a place of refuge and food, raiment and attention, did so with an existing intention and expectation of receiving a pecuniary recompense therefor. If all he did was intended as a gratuity then, after such free gift had been willingly bestowed and had become an accomplished fact, he could not change his mind and charge it as a debt. Neither, under such circumstances, where the father had not thought proper to claim a recompense from the child, would the administrator, after the father's death, be allowed to recover, as a debt due the intestate, that expenditure which the father had regarded as a mere gratuity, voluntarily conferred to meet the requirements of what he felt to be a moral obligation imposed upon him.

The law will not, in the absence of special circumstances, imply either an intention to charge or a promise to pay for board or services among members of the same family living together as one household. In such case the presumption naturally arises, from the very fact of the relationship, it was a gratuity. To rebut this presumption, ordinarily, either an express contract must be proven, or it must be shown by facts and circumstances that at the time the board was furnished, or services rendered, the one expected to receive payment, and the other to make payment.

The circumstances of this case strengthen the presumption of a voluntary gift, instead of tending to overthrow it; at least so far as regards the intention entertained by the intestate at the time he assumed control and care of his lunatic son, and for many years thereafter. He was an industrious farmer, owned a valuable farm in Madison county, of over two hundred acres,

on which he lived; had stock and personal property worth some $3,000; shortly thereafter purchased 154 acres of land in Iowa, which he fenced, and upon which he had a house built, and seems to have been in a prosperous condition. On the other hand his son, who was a mere youth and unmarried, was possessed of no real estate, and but little personalty; and what there was of this personal property was used up, or absorbed with that of the father and family. No steps were taken for many years to have a conservator appointed for him; no inventory was made of his personalty, and no administration thereon had; and circumstances seem to indicate that prior to 1876 the father had no knowledge or expectation even that his son was entitled to a pension as a soldier. Indeed, we find no facts existing in 1863, or for many succeeding years, which tend in any degree to disclose there was in the mind of the father even a hope he might be remunerated pecuniarily for the expense and trouble he was incurring.

It appears, however, that by 1876 there was a radical change in the circumstances of intestate; he was getting quite old, had heart disease, and was unable to do much work; he had met with misfortunes; his farm in Madison county was mortgaged for $7,000 or $8,000; he was in debt some thousands of dollars in addition to this, and was embarrassed in finances, and being pushed by his creditors. These troubles culminated, in his old age, in his being compelled to sell his farm to pay off the incumbrances, and in his having the Iowa lands deeded to his wife to compensate her for lands of her own that had been used in paying debts of his. These are facts the existence of which would fully have justified him in the forum of conscience in changing his mind, and resolving thereafter to demand from his son reasonable compensation for the necessaries of life thereafter furnished him. They, however, would not afford him legal ground for re-claiming that which he had already donated; the intent he had at the time must necessarily govern as to that. But the real question is, does the evidence establish it as fact that there was a change of his intention in this regard? The circumstances noted are inconclusive and unsatisfactory in their character;

and the decision could not fairly be deduced from them considered alone, his intent was otherwise than it had been. The controlling facts are these: That on the 7th of April, 1876, he made application and was appointed conservator of his insane son, and on the 14th of December, in the same year, applied for a pension for him. It is wholly improbable these two acts were done without any motive whatever; and equally improbable his object was that the pension moneys in arrears, and those to accrue, should be hoarded up until the death of the lunatic, and then be distributed to the next of kin. The reasonable and logical conclusion is that he proposed the pension money the lunatic was entitled to under the law, and would receive, should be applied to the purposes for which it was paid by the government—the support and maintenance of the insane man; and the conclusion is equally reasonable and logical that he intended thereafter to charge the son for necessaries furnished him. The inconclusive facts above suggested, when joined to these additional facts, have great probative force.

So long as the adult child stood in the attitude of a pauper, and was unable, by reason of his misfortune, to earn a livelihood, a moral obligation for maintenance was imposed on the father; but it was, at common law, but an imperfect obligation, because without legal sanction and not enforceable. The Pauper Acts also made him liable in a qualified way; but this liability, likewise, was grounded upon the poverty and incapacity of the son to labor. Either of these elements being eliminated, the *quasi* liability terminated *eo instanti*. When then it was ascertained the son was possessed of a claim for accrued and future pension moneys, which was property, the obligation of maintenance, as regards the father, ceased to exist. Primarily, and as between the two, no duty to maintain subsisted. Mills v. Wyman, 3 Pick. 207; Mercer v. Jackson, 54 Ill. 397.

It is manifest, then, that from and after the 7th of April, 1876, it was both the intention and the right of the intestate to charge his son for necessaries.

In order to fix the liability of defendant in error in this

action of assumpsit, there must also, necessarily, have been either an express or an implied agreement on the part of the lunatic to pay for the necessaries he received. Being *non compos mentis*, he had no capacity to enter into an express contract, and for the same reason he could not entertain at the time he was the recipient of the benefits conferred, an intention to make payment. But in analogy with the rule which prevails in the case of an infant, it has been settled law since the decision in Manby v. Scott, in 1659 (1 Sid. 112), that the contract of an insane person for necessaries supplied to him in good faith might be enforced. Nor is it necessary to prove a specific agreement, because the law raises a contract by implication on the part of the lunatic, by virtue of which the amount of such necessaries becomes payable as a debt. 1 Chitty on Contracts, 11 Am. Ed. 188; 1 Parsons on Contracts, 385, etc.; Ordronaux on Judicial Aspects of Insanity, Chap. 7, and authorities there cited.

The general rule is, that the contracts of a lunatic before office found are voidable only, and not void; but that after office found, they are absolutely void. The statute provision in this State is that every contract made by a lunatic after verdict of a jury, such person is a lunatic, shall be void as against the lunatic; and that every contract made before such finding may be avoided except in favor of the person fraudulently making the same. In Pearl v. McDowell, 3 J. J. Marshall, 658, the action was assumpsit against the lunatic after office found, and his person and property had been committed to a committee in the mode prescribed by the statute. The court, while admitting the contract of a lunatic, after office found and the party legally committed, was void, and that "it must be at the peril of him who deals with such a one," hold the law will bind the lunatic by implication to pay for necessaries; and argue that reason and humanity alike forbid such should not be the case under some circumstances. The court there say, "We are aware that there may seem to be an absurdity in supposing that a jury would be justified to find the implied consent of one whose express contracts are void because he has no capacity to consent. We think, however, that such rea-

Fruitt v. Anderson.

soning would be rather specious than solid. A lunatic is not permitted to bind himself by contract, because incapable of forming an opinion with respect to the propriety of such contract. But the law implies no promise which is not reasonable and just. Upon a proper case made out, although he can give no express consent, yet for necessaries furnished him the law presumes his consent, and he is bound." In McCrillis v. Bartlett, 8 N. H. 569, it was held, the statute of that State, avoiding the contracts of adult persons placed under guardianship was not intended to render void implied contracts for necessaries; and the court there say: "the statute must have a reasonable construction." See, also, 1 Parsons on Contracts, 387. A promise may be imperatively and conclusively presumed by law, from the existing relations between the parties, and sometimes the jury may infer a request or promise, even contrary to the fact, on the ground of legal obligation alone. 2 Greenleaf Ev. Secs. 102 and 108.

In the case before us, the intestate was the duly appointed conservator, and it was expressly made his statutory duty to apply the income and profit of the lunatic's estate to his comfort and suitable support. The lunatic had no estate in possession from which income and profit could be derived; but he was possessed of a valid claim for a pension from the government; the right to that pension was predicated solely upon the fact of his disability; the pension was proportioned to the magnitude of such disability; it was accruing at the rate of $50 a month; it was intended by the donor for the support of the pensioner, and the statute which allowed it expressly provided that it should "inure wholly to the benefit of such pensioner." How inure to his benefit otherwise, he being a hopeless lunatic without wife or child, than by being applied for the procurement of necessaries and comforts for him? Shortly before intestate's death, arrears of pensions amounting in the aggregate to $6,226.60, were received. The law will imply for the insane man no promise that is not reasonable and just. But it is pre-eminently just, and in full accord with the requirements of sound reason, that the pension money should be applied, at least in part, to the object for which it

was intended, in payment for necessaries of life that were fur-
nished the lunatic by one who at the time they were furnished,
expected to receive compensation when the pension money
should be collected. The case of Dodge, conservator, v. Cole,
97 Ill. 338, while it has no direct bearing on this case, sheds
light upon the matters under consideration.

There is one additional point to be considered, and that is as
to the effect of the statute of five years' limitation, which has
been interposed as a defense to the action. In the view we
have taken, it is wholly unnecessary to consider the effect of
that statute as regards any supposed cause of action accruing
prior to April 7, 1876. At that date the intestate was ap-
pointed conservator of the lunatic, and continued to act as
such as long as he, intestate, lived. The proper remedy of
a creditor of one who is adjudged to be insane, is by suit
against the conservator as his representative. Morgan v.
Hoyt, 69 Ill. 489. The term "cause of action" implies not only
a right of action, but also that there is some person in existence
who is qualified to institute process. The right must also be
capable of being legally enforced; and so there must also be
a person to be sued. Angell on Limitations, Ch. VII. It
was held in State, use of Stevenson v. Riegart, 1 Gill, 1, that Mrs.
Stevenson, being one of the personal representatives of her
husband, could institute no suit against herself at law, and
that the act of limitations, therefore, did not apply to the case,
and created no bar to the recovery of her claim. Brown v.
Stewart, 4 Md. Ch'y, 368; Montgomery v. Hernandez, 12
Wheat. 129. A man can not be both plaintiff and defendant
in a suit at law, and so intestate could not as plaintiff sue
himself as conservator.

We are of opinion the testimony with reference to the
small amount of personal property left on the farm when
John Anderson went into the army, is not of such character
as would make it proper to deduct its value from the amount
due intestate.

In our view, the findings of the court, under the evidence
in the record, should have been for plaintiff, at the rate of $50
per month, from April 7, 1876, to December 2, 1880, inclu-

sive, and this would amount in the aggregate to $2,791.66.

For the error in finding the issues in favor of defendant, and rendering judgment against the plaintiff, the judgment of the circuit court is reversed and the cause remanded.

Reversed and remanded.