## William Williamson et al. v. Warfield, Pratt, Howell Company.

### Gen. No. 13,287.

1. INSURANCE—*when equity has jurisdiction to enforce contract of.* An association, not incorporated, composed of a numerous and constantly shifting membership, with a manager having authority under the organization agreement to appear and defend suits for the association and an executive committee in control of funds, is subject to equitable jurisdiction in an action to enforce a contract of insurance.

2. INSURANCE—*when cancellation ipso facto does not result.* Withdrawal from an association of underwriters like the one involved in this case does not *ipso facto* cancel a policy of insurance issued to the party withdrawing.

Williamson v. Warfield, Pratt, Howell Co.

3. INSURANCE—*how cancellation provisions construed.* Cancellation provisions contained in a policy of insurance are strictly construed.

4. INSURANCE—*when cancellation not effected.* A policy of insurance is not canceled where there has been no return or tender of return of unearned premiums.

5. EQUITY—*when will take jurisdiction.* That no exact precedent can be found for the interference of equity, affords no reason for denying relief if equitable principles demand it. In the case at bar to avoid multiplicity of suits, and because the members of the association are numerous and widely scattered, because an accounting is necessary and because the administration of a trust fund is involved, equity will take jurisdiction.

6. EQUITY—*extent of relief granted under.* Where there is jurisdiction in equity to grant relief at all, and where it is desirable so to do and can be done without perversion or straining of the law, jurisdiction will be retained to do final and complete justice between the parties.

7. SPECIFIC PERFORMANCE—*what prayer sufficient to authorize relief of.* The prayer for general relief is sufficient to authorize the award of specific performance.

8. CONTRACT—*what competent to aid in interpretation of ambiguous.* Circumstances surrounding the execution of the agreement and those tending to show the construction which the parties to it themselves put on it, are properly received in evidence to show the meaning and effect of an ambiguous undertaking.

9. DECREE—*when should not be disturbed.* An allowance made by a master which is carried forward in the decree cannot be successfully complained of on review where no objection or exception was taken to such allowance.

Bill in chancery. Appeal from the Circuit Court of Cook County; the Hon. OSCAR E. HEARD, Judge, presiding. Heard in this court at the October term, 1906. Affirmed. Opinion filed October 3, 1907.

BARGER & HICKS, for appellants.

BATES, HARDING & ATKINS and FRY & HYDE, for appellee; THOMAS BATES and GEORGE C. FRY, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court, which overruled exceptions of the appellants (who were defendants below) to a master's report in the cause, confirmed the said

report, and after various findings ordered the appellants as a committee (selected and acting under a certain subscription agreement to be hereafter described) of an unincorporated association known as "The Merchant Underwriters At The Indemnity Exchange," to pay to the appellee $31,753.78 out of a certain trust fund by said decree found to exist in the hands of said committee. The decree also found that each subscriber to the aforesaid subscription agreement whose subscription was in force December 23, 1904, was indebted to the appellee for a proportionate part of said amount, and ordered that if the amount to the credit of any such subscriber in the hands of the committee was not sufficient to pay his proportionate share of the amount found by the decree to be due, then that the defendant Williamson as manager for said Indemnity Exchange should make demand for the deficiency and collect the same from such subscriber; the actions of the said manager to be subject to the supervision and review of the court. The decree further provided that the court, for the purpose of enabling the appellee to have the full benefit of the decree and to collect the money found due to it, should retain jurisdiction in the cause to make further necessary orders.

To set forth as antecedent to this opinion a statement of the pleadings and facts which eventuated in this decree is unnecessary, as in the discussion of the questions raised on the appeal they will sufficiently appear.

The first objection, for example, made by the appellants to the decree is that there was no jurisdiction in equity to dispose of the matters involved in the cause, and that as the complainant had a full, complete and adequate remedy at law, the bill of complaint should have been dismissed for want of equity. This necessarily requires in its consideration a statement of the circumstances out of which the suit sprang.

Warfield, Pratt, Howell Company, the complainant and appellee, was an Iowa corporation, in the wholesale grocery business, having stores at Des Moines, Cedar Rapids and Sioux City. "The Merchant Underwriters At The Indem-

Williamson v. Warfield, Pratt, Howell Co.

nity Exchange" was an association which certain individuals, firms, and associations, for the purpose of obtaining advantageous lines of insurance for themselves and to indemnify each other against loss by fire, had formed under that name.

From January, 1902, to December 23, 1904, the houses of the complainant at Des Moines, Cedar Rapids and Sioux City respectively were managed by different persons, the accounts of said houses were kept separately, and each of the three houses had independent charge of the insurance matters pertaining thereto, obtaining insurance and paying the premium, although the house at Des Moines was regarded as the main house and kept a general supervision over the branches at Cedar Rapids and Sioux City.

The "Indemnity Exchange," as the association of "The Merchant Underwriters," etc., was generally called, had in January, 1902, established an office in Chicago under the charge of William Williamson, manager, and Royal M. Williamson, deputy manager. The agreement heretofore mentioned, by which the association was constituted and under which it was acting, appointed William Williamson the attorney of the subscribers "to underwrite policies" against loss by fire or lightning for such firms, corporations and individuals as became subscribers. His further duties are also defined by the agreement, "to make cancellations and changes" in the policies, "to collect all sums due to subscribers, to adjust and settle any loss and to perform such other acts in relation to the policies as the subscribers could do." The manager was also to "commence and prosecute any proceedings at law in connection with any policy issued by him which he might deem proper, to compromise or settle or withdraw the same," and to "appear for the subscribers in case of any proceedings at law being taken against them in connection with any policy, and in their names defend, compromise or settle same." The agreement provided also for a committee to be chosen from and by the subscribers for each calendar year, who should supervise the business, examine accounts, invest the moneys belonging to the subscribers coming into the hands of the manager, which moneys

the manager should monthly deposit with the committee, pay from said moneys such losses as the manager might determine had occurred under the policies issued by him, and pay once annually to each subscriber his portion of the earned premiums remaining in their (the committee's) hands, and the interest received by them.

The further provisions of importance in the agreement. were as follows:

"A sum which each subscriber shall deposit shall gauge his interest in the business in that an amount not exceeding under any policy such sum deposited shall be underwritten severally for each subscriber. Such deposit, herein denominated subscription, may be of any amount the depositor may elect if a multiple of twenty dollars."

"If any subscriber so requests of him in writing, the manager shall at once discontinue further underwriting for him. Within thirty days thereafter all unexpired insurance granted for him shall be cancelled or reinsured, and he shall be paid by the committee his portion of all funds in their hands. In like manner the manager may at his discretion discontinue any subscriber."

"The manager may deduct from moneys belonging to each subscriber a sum equal to 20 per cent of all premiums received for that subscriber under policies issued, and in consideration of this percentage he shall defray all expenses incurred" for incidental business expenses.

After some preliminary negotiations and correspondence, to be hereafter alluded to in another connection, the Warfield, Pratt, Howell Co., by J. W. Howell, secretary, at Des Moines, on January 24, 1902, signed a copy of this subscription agreement, which begins:

"The undersigned hereby adopt and agree to the following plan for maintaining an office where policies of fire insurance may be underwritten for the firms, corporations and individuals who have executed or shall execute instruments similar to this and who are herein called the subscribers."

Across the top of the agreement was written, "Sioux City —Cedar Rapids—Des Moines."

Williamson v. Warfield, Pratt, Howell Co.

Three days before the date of this subscription agreement $100 had been paid to the deputy manager of the exchange as a subscription by the Des Moines house, and on January 23rd at Cedar Rapids $100 was paid as a subscription deposit by the Cedar Rapids house, and on March 5th $100 and on May 19th $100 by the Sioux City house, these subscriptions by the Sioux City house being sent by mail to Chicago. Various insurance policies were issued by the exchange to each of the houses on the goods carried by them respectively in 1902, 1903 and 1904. Between April 4, 1904, and the latter part of October, 1904, six policies were written and issued by said exchange on the stock of the Sioux City house and sent to said house, as follows:

| Policy No. | Date of Expiration. | Amount. | Premium Paid. |
|---|---|---|---|
| 10556. | April 22, 1905. | 3500. | 32.73. |
| 10797. | May 14, 1905. | 5000. | 70.13. |
| 10848. | June 5, 1905. | 10000. | 93.50. |
| 10958. | June 4, 1905. | 3500. | 32.73. |
| 11154. | August 5, 1905. | 5000. | 46.75. |
| 11554. | October 18, 1905. | 3000. | 28.05. |

The premiums charged by the exchange were paid from the Sioux City house by the complainant.

December 23, 1904, the stock of goods of complainant at Sioux City, of the value of over $160,000, was totally destroyed by fire. Said stock at the time of the fire was insured to the amount of $156,500, $30,000 of which sum was claimed to be covered by the six policies above described, and the balance of $126,500 was covered by policies written by other companies.

On January 7, 1905, proofs of loss were made and forwarded to the Indemnity Exchange at Chicago, and on January 10, 1905, the receipt thereof was acknowledged by Williamson, the manager, by letter of that date addressed to the Des Moines house. No objection was made by defendants to the proofs of loss filed by complainant, but defendants denied any liability for said loss on the ground that the

complainant was no longer a member of said Indemnity Exchange, but had ceased to be a member on the 15th day of December, 1904, by reason of a certain letter of the date of December 13, 1904, from the Des Moines house of the complainant to the manager of the exchange and a reply thereto by the deputy manager thereof under date of December 14, 1904, by reason of which letters, as it was claimed, all outstanding policies of insurance issued by the Indemnity Exchange to complainant for any of its houses terminated and were cancelled on December 15, 1904.

Because of this refusal by the exchange to pay the claims on the before described policies, the bill in chancery in this cause was brought. The original bill set up the execution of an agreement dated March 5, 1902, at Sioux City, and another dated May 19, 1902, at Sioux City, between the complainant and the Indemnity Exchange, of the form which is before described, and the payment of $100 as a subscription deposit on each occasion, the character and constitution of the exchange, and the membership of the committee by the defendants; that there were more than 600 subscribers to the exchange; that it had issued policies of insurance to subscribers in nearly all the States of the Union, and also outside of the United States; that the number of said subscribers was constantly changing by reason of the discontinuances of such subscription agreement by the makers thereof, other parties taking their place; that the greater number of subscribers resided without the State of Illinois, and their names and addresses were unknown to the complainant; that to make all the subscribers parties defendant to the bill would be impracticable and productive of useless litigation, and that the committee fully represented the interests of all the subscribers and policy holders of the exchange. The bill also set up the several policies of insurance on the complainant's stock of goods at Sioux City, as before described, and that there had been a total loss by fire of said goods, the loss being greater than the amount of all the policies of insurance covering the same, hich policies aggregated $156,500. It set up further the enial of liability by the

Exchange (although no objection or exception was made by it to the proofs of loss), and that there was on deposit in bank or in bonds of the United States to the credit of said Indemnity Exchange or its manager or committee, for the use or benefit of said exchange of the subscribers thereto, more than $120,000.

The bill prayed for an answer from the defendants, that the court might ascertain the amount due complainant, that an account might be taken between complainant and the exchange and the other defendants, the manager and committee thereof, and the defendants be ordered to pay to the complainant the amount that might be found due it on such accounting, and in case there should not be a sufficient sum of money in bank or in bonds of the United States belonging to the exchange available for the payment of the amount found due the complainant, that the defendant Williamson, the attorney and manager, be ordered and directed to determine the amount necessary to be paid by each subscriber, and to make demand upon said subscribers for their respective payments and to collect the same in the manner provided in the subscription agreement, to be then paid to the complainant.

After a general demurrer to this bill had been filed and withdrawn it was answered by the defendants jointly, denying the alleged agreements of March 5, 1902, and May 19, 1902, at Sioux City, and averring the execution of one agreement only by the complainant, and that on January 24, 1902. It denied liability on the policies of insurance held by the complainant, on the ground that they had been cancelled by the withdrawal of the complainant from the association on December 13, 1904. It averred that the complainant had no right to an accounting and prayed the benefit of a demurrer.

During the taking of the evidence before the master complainant obtained leave to amend its bill to make it conform to the facts and the proof that the only subscription agreement executed by the complainant was at Des Moines on January 24, 1902. The allegations concerning the subscription

agreement were accordingly changed, and it was further averred that after the execution of such an agreement at Des Moines, on March 5, 1902, and May 19, 1902, respectively, the Sioux City house of the complainant made its separate and distinct subscription for itself alone under the said agreement and paid thereon to said Indemnity Exchange the sum of one hundred dollars on each occasion, which amounts the Indemnity Exchange received as the separate and distinct subscriptions of said Sioux City house of Warfield, Pratt, Howell Co. under said agreement.

To meet these amendments the defendants amended their answer, denying the allegations as to separate and distinct subscriptions, and averring the fact to be that on the said dates "the said complainant through its Sioux City branch paid to said Indemnity Exchange the said sums as additional subscriptions under the original subscription agreement, for the purpose of enabling the complainant to get a larger line of insurance from the said Indemnity Exchange, and that said subscriptions from said Sioux City branch and the other branches of said complainant company were kept in separate accounts on the books of said Indemnity Exchange at the special instance and request of said complainant for its own convenience in keeping the expenses and costs of the insurance of its different branches separate."

As before indicated, it is a contention of the appellants that the matters set forth in the pleadings and appearing in evidence furnish no ground for the exercise of equitable jurisdiction or interference, even on the assumption that there was a liability on the policies involved when the suit was brought.

It is argued that there is an adequate remedy at law to enforce the liability if it exists; that each of the five hundred or more insurers under the agreement has a separate contract and is entitled to a trial by jury; that the necessity of a multiplicity of suits at law does not render the exercise of chancery jurisdiction justifiable, because the appellee voluntarily put itself into the situation requiring it; that the alleged necessity and prayer for an accounting between the

Williamson v. Warfield, Pratt, Howell Co.

complainant, the exchange, and its subscribers, does not furnish a ground for a chancery decree, because the accounting was abandoned or refused, and that the theory of a trust fund in the hands of a committee cannot be sustained as a reason for equitable relief, because the title to said funds is by the agreement in the subscribers and not in the committee or manager. There can be, therefore, it is said, no equitable lien upon them to be enforced. The manager and committee are agents and nothing more. Moreover, it is urged that the authorities in the case of analogous Lloyds' Insurance policies show that a suit at law to determine the liability is necessary.

We have considered all these arguments and the authorities cited to sustain them, but we are not of the opinion that the contention is sustained.

The appellee is right, as it seems to us, in the statement that the question is not whether a case on all fours like the one at bar can be found in the books, but whether there are equitable principles which are applicable.

The quotation from Dodge v. Cole, 97 Ill., 338, is apt: "The jurisdiction of a court of equity does not depend upon the mere accident whether the court has in some previous case, or at some distant period of time, granted relief under similar circumstances, but rather upon the necessities of mankind and the great principles of natural justice which are recognized by the courts as a part of the law of the land and which are applicable alike to all conditions of society, all ages and all people. * * * Where it is clear the circumstances of the case in hand require an application of those principles, the fact that no precedent can be found in which relief has been granted under a similar state of affairs is no reason for refusing it."

We do not think that the authority in relation to a Lloyds policy cited by the appellants from New Jersey—Enterprise Lumber Co. v. Mundy, 62 N. J. L., 16—would, even if we felt ourselves bound to follow it, be at all conclusive against equitable jurisdiction in the case at bar, from which, as pointed out by appellee, it materially differs.

178  Appellate Courts of Illinois.

Vol. 136.]  Williamson v. Warfield, Pratt, Howell Co.

In the present case we think that the relief asked and given can be referred to several recognized grounds of equity jurisdiction. The constitution of the Indemnity Exchange differentiates it entirely from an ordinary insurance company. It is an unincorporated association, of a very numerous and constantly shifting membership. Every act in connection with the business of the company has to be done by the manager and the committee, of which he is an *ex-officio* member. The manager is authorized by the agreement, in case of any proceeding at law or equity, to appear and defend for the subscribers. Under these circumstances it is a commonplace of the law that the subscribers who are ultimately liable do not all have to be made parties to a suit. The defendants who were made parties to this suit adequately represent them. Webster v. French, 11 Ill., 254; Ryan v. Lynch, 68 Ill., 160; Baird v. Jackson, 98 Ill., 78; Story's Equity Pleadings, section 77; Daniel's Chancery Practice, p. 272. But if not all the 500 subscribers have to be made parties, no one more than another of them is entitled to a jury trial.

It is insisted that because each policy of insurance contains the clause, "It is understood and agreed that there is assumed by each subscriber as if a separate policy was issued therefor, a sum which is the same proportion of the aggregate amount insured herein that each subscriber's subscription bears to the aggregate of all the subscribers' subscriptions"— the undertaking is several and not joint, and should not have been made the subject of this single chancery suit. This is too narrow a view of the situation. The undertaking in the policy, like that in every insurance policy, is not unconditional, but contingent, a contract of indemnity, and while each subscriber to the exchange "assumes" a certain liability with relation to the policies issued by it, the agreement provides effectively for the existence of a fund in the hands of the committee at all times, springing from business receipts and deposits, out of which the losses occurring under the policies shall be primarily paid. It is only in case "losses occur of an amount sufficient to require for their payment

a part of the subscriber's subscription" that the subscriber "upon demand" from the manager and committee shall "pay an amount adequate to defray his portion of such losses and leave his subscription intact."

Under such an arrangement, to avoid multiplicity of suits (Chicago v. Collins, 175 Ill., 445; North American Insurance Co. v. Yates, 214 Ill., 272; Smith v. Bank of New England, 70 N. H. 187; Pomeroy's Equity, section 245), and because the exchange is an unincorporated association, whose members are numerous and widely scattered (Guilfoil v. Arthur, 158 Ill., 600; Fitzpatrick v. Rutter, 160 Ill., 282; Quick v. Lemon, 105 Ill., 578), and because the association of the subscribers is such that an accounting of a sort is required, in which the committee and manager are necessary factors (Taylor v. Dean, 22 Beav. 429; Clark v. Spafford, 47 Ill. App., 160, in which case the court says: "Enforcement of contributions from the numerous parties to the agreement for mutual indemnity and the ascertainment and assessment of the proportionate shares of such parties are proper subjects for a court of equity, to which its methods of procedure are well adapted"), equity will take jurisdiction.

We do not agree with the contention of appellants that it is not within the option of the appellee to avoid a multiplicity of suits because it voluntarily became a subscriber and policy holder—thinking, rather, in the language of the Supreme Court of New Hampshire (Smith v. Bank of New England, *supra*) as to a like contention, "that it is supported by no authority and has no foundation in principle." But even if this were true, the other grounds for equitable interference already mentioned would remain, and another, which seems entirely conclusive to us, could be added.    It is that the primary claim of the complainant as set forth in its bill and proven in the evidence, was for the administration of a trust fund by trustees.    Beach on Trusts, section 750.

It is not of course denied that equity is the proper forum in which to seek the enforcement of a claim against a trust fund through its trustees, but it is insisted that because under the agreement the legal title to whatever money or fund was

under the control of the manager and committee was not in them, they were not trustees, nor the fund a trust fund in the sense which would support this bill in chancery. Again we must say that the appellants take too narrow and technical view of the matter. The fund in question was one accumulated in the hands of the appellants under a system and plan of business which placed them strictly in fiduciary relation to it. It was theirs to manage and control in the interests of others who had no power of interference with it. The complainant had a right, as it alleged, to a special distribution of it, which it could only enforce through those who controlled it. It was for the purposes of this litigation, a trust fund, and the committee which held it were trustees, and this independently of any technical question as to their holding the legal title to it. This is the doctrine of right reason and it is also, as we think, fortified by authority. Covenant Mutual Ben. Association v. Sears, 114 Ill., 108; Chicago Mutual Life Ind. Ass'n v. Hunt, 127 Ill., 257; Smith v. Bates Machine Co., 182 Ill., 166; Gough v. Satterlee, 32 App. Div. N. Y., 33.

It is true that appellants suggest that there was no evidence that at the time of the hearing there was any money in the hands of the appellants, but this proposition can hardly be considered as important in view of the fact that it was admitted at the hearing (and found by the master) that they held at the time of the institution of the suit, applicable to the payment of losses, $120,000. No evidence was offered by defendants that the situation had changed, and it must be presumed to have remained the same up to the time of the decree.

But it is insisted that even admitting the chancery jurisdiction, the decree was improper and unwarranted in its form, that the utmost that the court would be warranted on the record in decreeing, even under complainant's own theory, was that an account should be stated by a master and reported to the court as a foundation for further action.

It is contended that the bill of complaint is for an accounting simply, while the decree is for a specific perform-

Williamson v. Warfield, Pratt, Howell Co.

ance of certain contracts—"a result" counsel say, "manifestly not embraced within the theory of the pleadings in the case and inconsistent with the relief sought by the pleadings, as well as the case made upon the hearing."

We think this again is a narrow and technical view of the cause, and if followed necessarily productive of useless litigation. If there were jurisdiction in equity, as we have decided there was, to grant relief at all, it was desirable that the relief granted should be adequate and that it should, so far as the result could be brought about without perversion or straining of the law, do complete and final justice between the parties. We do not think, assuming that the merits of the cause were correctly decided, that the decree went farther than was proper in this direction.

The objection to it amounts to this—that there is a variance between the relief prayed for and the relief granted. We do not think so. Independently of the prayer for general relief, under which there seems to be little doubt that by settled rules of chancery practice the relief of a specific performance could be enforced without its being especially asked for in the bill (Story's Equity Pleadings, section 40; Shields v. Bush, 189 Ill., 534, 544; Brathwait v. Henneberry, 222 Ill., 50–54; Harley v. Sanitary District, 54 Ill. App., 337), there is a specific prayer in the bill, in almost the words of the decree, that the attorney and manager of the exchange be ordered to make demand upon the subscribers for such payments as are necessary, collect the same and pay them to the complainant.

The decree provides that the action of the manager in this behalf shall be subject to the supervision and review of the court, and expressly reserves jurisdiction of the cause to give the parties liberty to come into court and adjust any difficulties that may arise in its execution. It provides merely that as the court has decided that the policies of insurance belonging to the complainant were in force and should be paid, the manager, committee, trustees and agents of the exchange, should proceed, as in the regular course of business under the policies they were bound to proceed, to carry out their con-

tracts.    If they have available money enough in their hands
to pay without an assessment, they can and should do it; if
not, they should proceed as they would have proceeded had
they not wrongfully refused to acknowledge liability under
the policies.    The relief is not inconsistent with the bill, nor
is it different from that approved by our Supreme Court, by
this court and by other courts in analogous cases.    Covenant
Mut. Benefit Association v. Sears, 114 Ill., 108; Rowell v.
Covenant Mutual Life Association, 84 Ill. App., 304; Ham-
merstein v. Parsons, 38 Mo. App., 332; Hutchinson v.
Wright, 25 Beavan, 444.

We are thus brought to the real merits of the cause; in
other words, to the determination of the question whether
the policies sought to be enforced in this suit were in force
on December 23, 1904.    It is conceded that they were so in
force unless cancelled solely by the correspondence between
the complainant and the manager of the Indemnity Exchange
of December 13th and 14th, 1904.    This correspondence was
as follows:

"J. W. H.                    Des Moines, Iowa, Dec. 13, 1904.
William Williamson,
        Manager Indemnity Exchange,
                Chicago, Ill.
Dear Sir:    We herewith return to you policy No. 11,849,
beginning December 15th, 1904, designed to renew our pol-
icy expiring on that date, as we do not wish to renew the
policy.    We also hereby give you notice of our withdrawal
from subscribership to the Indemnity Exchange.    Kindly
send us statement of our account with you, and oblige,
                                Yours truly,
                        WARFIELD-PRATT-HOWELL Co.,
                                A. A. C."

                                "Chicago, Dec. 14, 1904.
Warfield-Pratt-Howell Co.,
        Des Moines, Iowa.
Gentlemen:    We beg to acknowledge receipt of your favor
of the 13th inst. with policy No. 11,849, returned for can-
cellation, and to state that your account will be liquidated

pursuant to the terms of the agreement following the expiration of the policy.

Yours faithfully,
R. M. WILLIAMSON,
Deputy Manager."

The contention of the appellants is that the letter of the complainant company from its Des Moines house on December 13, 1904, withdrew the company altogether from the Indemnity Exchange and by thus cancelling its subscribership cancelled all outstanding insurance on all its branches. To this contention the appellee opposes these claims:

First. That assuming the letter of the complainant from Des Moines on December 13th to have been a notice of a desire to withdraw the other branches of the complainant company as well as the Des Moines house from the exchange, it did not and could not operate *ipso facto* as a withdrawal, but would only work a withdrawal at the expiration of 30 days or on the prior cancellation or reinsurance of all the risks on which the withdrawing subscriber was liable.

Second. That the withdrawal of the subscription to the exchange does not under the provisions of the policy *ipso facto* cancel the insurance which the withdrawing subscriber may hold, but that such insurance remains in force until its expiration by the terms of the policy itself, or until its cancellation under those terms.

Third. That in no event can cancellation of insurance policies be considered effective until the unearned portion of premiums paid are returned or tendered.

Fourth. That the letter of December 13th did not withdraw and was not intended nor understood to withdraw the Sioux City house of the complainant company from the Indemnity Exchange. This involves the further proposition that notwithstanding but one subscription agreement was signed by the complainant company (that at Des Moines of the date of January 24, 1902), yet it was agreed and understood between the said company and the manager of the Indemnity Exchange that under that agreement each house of the complainant might subscribe such amount as should be

agreed upon between each house and said manager of the exchange, and that each of the said three houses should be regarded as though each had executed a separate agreement.

The first three of these propositions are of law and turn upon the legal construction of the contracts and the relations of the parties; the fourth is a mixed one of law and fact.

It is obvious that if any one of them is sustained, the main question at issue must be resolved in favor of the appellee.

We are of opinion that each and all of them are true. If there be a doubt in our minds as to any one, it is only as to the third. We do not, however, conceive it to be necessary in this opinion to discuss at length any one of them.

Of the first proposition it is sufficient to say that after a careful consideration of the subscription agreement, we are of the opinion that until the expiration of thirty days from the notice of withdrawal, or until the prior reinsurance or cancellation of the risks on which the subscriber is held, and the payment to him of the proper portion of the funds in the committee's hands belonging to him, his withdrawal is not complete. We do not regard the cases of mutual benefit society certificates cited by the appellants as in point against this contention.

But if this first proposition were not sustained by us, we should nevertheless be at a loss to find in the subscription agreement or in the policies any provision that cancels the policies of a subscriber on his withdrawal from the association. We have carefully considered the argument of the appellants that such a provision is implied by the constitution of the exchange and by making the subscription agreement a part of the policies, but we are not convinced by it. The subscription and the policies, however connected, were all to a great extent distinct. The amount of insurance that could be obtained did not depend at all on the amount of the subscription. As subscribers the parties were the insurers—as policy holders the insured. It was so far a mutual arrangement that only subscribers could become policy holders, and

undoubtedly it was the policy and intention of the managers of the exchange to cancel the insurance of a withdrawing subscriber as soon as it might be legally done without loss. But the method of such cancellation was defined in the policy. There was nothing in the agreement concerning it, while it was specifically set forth in the policies, which were the later contracts.

Cancellation provisions are always strictly construed against the insurers (Niagara Fire Ins. Co. v. Scammon, 100 Ill., 645; Healey v. Mutual Accident Association, 133 Ill., 556–561), but we do not find here the necessity of considering this rule even, for there is no cancellation provision relied on. The cancellation claimed is an implied one, and we fail to recognize the implication.

The third proposition is strenuously objected to by the appellants as inapplicable at least to a case like this. It is said that a virtual cancellation of the insurance was the act of the assured, and became effective without return of the premiums by the company; because the surrender of the policies themselves by the assured must precede a claim for the unearned premiums from the company.

Our disposition to hold the proposition correct and applicable, however, springs from a different view of the relations and agreements of the parties, and from our opinion that the policies would continue in force after a withdrawal from membership until affirmative action by the company. That such action should include a return or tender of the unearned premiums is certainly the doctrine laid down by this court in Hartford Fire Insurance Co. v. McKenzie, 70 Ill. App., 615, and Peterson v. Hartford Fire Insurance Co., 87 Ill. App., 567, and it was considered by this court that the doctrine was that enunciated by the Supreme Court in Peoria M. F. Ins. Co. v. Botto, 47 Ill., 516, and Ætna Insurance Co. v. Maguire, 51 Ill., 342.

The question is academic in this case, however, because of the view we take not only of the preceding propositions of the appellee we have discussed, but also of the succeeding one, which we have numbered fourth.

· It was on the matters of fact involved in it that most of the evidence in this cause was taken. It is vigorously contended by the appellants that this evidence does not support the findings of the master and the decree of the chancellor that it was agreed that each house of complainant might subscribe such amount as should be agreed on between each house and the manager of the Indemnity Exchange, and that each of the three houses should be regarded as the same as though each had executed a separate agreement; nor the further finding by the master that the complainant's letter of December 13, 1904, cannot be properly construed to affect any house of the complainant except that at Des Moines, and that the manager of the exchange understood that the withdrawal of the Des Moines house was alone intended by the complainant.

It is insisted that the contention of the appellee in this regard is an afterthought, born of failure to substantiate the allegations of the bill before amendment that there were separate subscription agreements signed by the Sioux City house on March 5, 1902, and May 19, 1902, and that it is contrary to the facts shown.

The circumstances surrounding the execution of the agreement and those tending to show the construction which the parties to it themselves put on it were properly received in evidence to show its meaning and effect. Wells v. Carpenter, 65 Ill., 447; Wilson v. Roots, 119 Ill., 379; Minneapolis Lumber Co. v. Coal Co., 160 Ill., 85; Carroll v. Drury, 170 Ill., 571; Walker v. Ill. Cen. R. R. Co., 215 Ill., 610. These circumstances include the correspondence, conferences and conversations between the parties before the execution of the agreement, and the correspondence passing and the business transacted between the parties after the agreement was signed up to the time of the fire. It is not our purpose to go over them. They are to some extent discussed in the master's report in the record. We have considered them independently and we are forced to the same conclusion at which he arrived, and which was approved by the chancellor.

We are convinced that if there was an afterthought in-

volved in the contention, on this subject, it was on the part of the manager of the Indemnity Exchange. We doubt if anything on his part looking towards or recognizing as accomplished the cancellation of the Sioux City policies would have taken place as the result of the Des Moines letter of December 13, 1904, had it not been for the unfortunate fire of December 23rd.

There is an objection made by appellants to the inclusion in the decree of $157.95, which was the amount found by the master (on the admissions of the answer) to be due to the Des Moines house on the liquidation of its account, on the theory that the matter was to be treated as though there were separate subscriptions and agreements for the three houses. There was no specific objection or exception to the finding of the master on this point, and the decree should not be disturbed on account of the allowance. We think it was justified.

The decree of the Circuit Court is affirmed.

*Affirmed.*