The Merchants Underwriters at the Indemnity Exchange et al., Plaintiffs in Error, v. The Parhurst-Davis Mercantile Company, a corporation, Defendant in Error.

### Gen. No. 13,677.

1. INSURANCE—"*concurrent*" *insurance clause construed.* A clause in a policy of fire insurance which provides that "$150,000 total concurrent insurance is permitted" means $150,000 in addition to the policy in which the clause appears.

2. INSURANCE—*how policy to be construed.* A policy of insurance ambiguous in its terms is to be construed most strongly against the insurer.

3. INSURANCE—*good faith required of members of co-operative mutual organization.* The court indicates in this case that co-operative mutual insurance organizations involving confidential and fiduciary relations might exist which would render it a fraud for one member to fail to make full and fair disclosure of premium rates required to be paid by him when placing insurance through the ordinary channels; but the court holds that this case does not come within such principle.

4. INSURANCE—*when defense under subrogation clause insufficient.* A defense of settlement with a wrongdoer without the consent of the insurer, thus preventing the operation of the subrogation clause in favor of such insurer, is an affirmative defense, and must be sustained by evidence; first, that the claim against such wrongdoer actually existed; second, that the insured, without the consent of the insurer, actually released such claim.

Bill in chancery. Error to the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed April 6, 1908.

BARGER & HICKS and RALPH CREWS, for plaintiffs in error.

FREDERICK A. BROWN, WILLIAM F. SCHOCH and LEE MONROE, for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

This is a writ of error sued out to reverse a decree entered by a chancellor of the Superior Court January 4, 1906, against the plaintiffs in error, who were de-

fendants in that court, and in favor of the Parkhurst-Davis Mercantile Company, a corporation, complainant there and defendant in error here. The decree is for the payment of $32,512.50.

The plaintiffs in error are certain persons and corporations who, with others, are combined for insurance purposes in an unincorporated organization or association called the Merchant Underwriters at the Indemnity Exchange. They are, however, a few only out of more than five hundred such corporations, firms and individuals scattered over the United States and the British Provinces in America who are members of said association. They were selected as the defendants in the bill of complaint filed in this cause, so the bill states, "as the representatives of all of the said subscribers and for the purpose of subjecting the funds which are now within the jurisdiction of the court to the payment of the complainant's claims."

William Williamson, R. M. Williamson, W. B. Thayer, S. L. Underwood and E. E. Smith, who are among the defendants below and the plaintiffs in error here, are a committee selected and acting under the agreement of these many members of the association, to supervise the business of the association (which was principally, under the agreement, actually to be performed by a manager, the said "William Williamson," and his deputies, representatives and assistants), and to take in their charge and control the income of the association and "to pay therefrom such losses as may be determined by the manager as having occurred under policies issued by him." The decree for the payment of the money runs against them as having in their hands the funds properly chargeable, and they sued out the writ of error, the other plaintiffs in error subsequently appearing.

The plan and scope of the association, with all the provisions of the agreement that are important in this litigation, are set out in an opinion filed by this court in William Williamson et al. v. Warfield, Pratt, Howell

Company, 136 Ill. App. 168, to which reference is now made for those details. The question was raised in that case, as it has been in the one at bar, whether it was a proper case for the exercise of equitable jurisdiction. We held that it was such a case for reasons set forth in the opinion. As the opinion in that case, however, was not filed until after, in this case, the writ of error was sued out and the original briefs and arguments printed, this question has been herein again argued. It is conceded, however, by the plaintiffs in error in their reply brief, that in all but one point (which we do not think differentiates the cases) their contentions in this regard are negatived by this court in the opinion in the Warfield Company case. The suggestion that the allegation in the bill that "the subscribers to the written agreement, who by the terms and conditions thereof became liable for the payment of the sums due to the complainant under the policies, have made payments of large sums of money required by the terms of the agreements to be by them made, of which sums so paid more than fifty thousand dollars are now in the hands of and under the control of the committee," shows "that there is an adequate remedy at law against the committee as individuals for money had and received," does not appear to us forceful. As we have indicated, it does not distinguish this case from the Warfield Co. case. In that case there was, as we found, a sum in the hands of the committee to pay losses, largely in excess of the amount claimed by complainant, but we said there, as we can say here, "The fund in question was one accumulated in the hands of the appellants under a system and plan of business which placed them strictly in fiduciary relations to it. It was theirs to manage and control in the interests of others who had no power of interference with it. The complainant had a right to a special distribution of it, which it could only enforce through those who controlled it. It was, for the purposes of this litigation, a trust fund, and the committee which held it were

trustees; and this independently of any technical question as to their holding the legal title to it. This is the doctrine of right reason, and it is also, we think, fortified by anthority.''

We have not changed our opinion on this point. The Warfield Company case is now in the Supreme Court. Unless and until we are overruled by that higher authority we shall adhere to the conclusion we have formed.

This case must therefore be considered by us on its merits. Was the complainant below entitled, as held by the chancellor, to the decree in its favor on the insurance contracts which it set up in its bill and established by its proofs?

The defendants below especially affected by the decree attempted to secure a review of this question on appeal two years ago, but the appeal was dismissed by the Branch Appellate Court March 5, 1907, for the want of a sufficient appeal bond. 131 Ill. App. 617. The present writ of error was then sued out.

It is not denied that policies of insurance as set up in the bill were issued to the complainant therein, The Parkhurst-Davis Mercantile Company, by The Merchants' Underwriters at the Indemnity Exchange—one for $10,000, dated May 29, 1903, and another for $20,000, dated October 13, 1903—both covering its general stock of merchandise at Topeka, Kansas, and insuring it up to the amounts named against loss or damage by fire, and each running for a year from its date. Nor is it denied that on February 13, 1904, the stock insured was burned and damaged by fire to an amount greater than all the insurance which the complainant had upon it.

The defense that is made to the claim of complainant that this rendered The Merchants' Underwriters, etc., liable for the amount of its policies is threefold. We will take up each of the three points in this defense separately, first stating each in the terms employed by the plaintiffs in error.

The first is: "That the complainant in taking out insurance in the total sum of $160,000, without notice or consent of the Merchants Underwriters, while only permitted by the terms of the policies sued on to carry a total concurrent insurance of $150,000, rendered the said policies void."

If by this statement it is meant that the policies sued on only allowed $150,000 of insurance altogether, we think it is a misconstruction of them. The clause in question, identical in both policies, is simply this: "$150,000 total concurrent insurance permitted." This immediately follows the effective insurance clause naming the amount, the term and the property insured. That is, the insurer declares that it insures the stock in question for one year to the amount of $10,000 in one case and $20,000 in the other, and then says that $150,000 total "concurrent" insurance is allowed. What does "concurrent" mean in this connection? "Running with" is the etymological meaning of the word. "Operating with" is one of the principal meanings given to it by standard lexicons. "Running *with*" what? "Operating with" what? The insurance just issued, it seems to us. But if a total of $150,000 is to be allowed to "run with" or "operate with" the insurance policy in which the clause is found, it has not been exceeded. The insurance outside of the $10,000 policy is only $150,000. Outside of the $20,000 policy it is only $140,000. There is no claim that the property was insured beyond its value. We are quite aware that it is possible to put a different construction on the clause and to read it as meaning that all the insurance, including that made by the policy in which it occurs, was to be limited to $150,000. But this seems to us less natural than the construction which we have given to it. The use of the word "permitted" by the company, which is inapt to include the amount which it has itself written, seems rather to consist with our interpretation.

The usual provision in the policy, that "This entire

policy, unless otherwise provided by agreement endorsed hereon or added hereto, shall be void if the insured now has or shall hereafter make or procure any other contract of insurance, whether valid or not, on property covered in whole or in part by this policy," sheds no light on the matter farther than to emphasize the argument that the word "permitted" in the clause making an exception to this general provision, is used in its ordinary sense. No endorsed or added clause was necessary to make the $10,000 and the $20,000 policy valid in itself. The clause *was* necessary to make additional insurance allowable. How much additional and "concurrent" was "permitted?" The clause gives the answer, $150,000.

It is a commonplace of insurance law that where a provision is equally susceptible of more than one construction, that construction must be adopted which bears most strictly against the insurer. As in this case, the construction contended for by the complainant seems the more natural to us—it *a fortiori* must be adopted by us. We cannot agree with the Supreme Court of Missouri in its reasoning in construing a similar clause in Senor v. Western Millers Mutual Fire Ins. Co., 181 Mo. 104.

Our view renders unnecessary a discussion of the question, elaborately argued before us, whether the insurers waived the objection of over insurance, if it existed.

The second ground of defense is thus stated by the plaintiffs in error:

"The complainant, by misstating and failing and refusing to correctly state to appellants the premium rate it was paying to other insurance companies for insurance upon its risk, committed a fraud upon the plaintiffs in error and thereby rendered the policies void."

More developed, the contention is, that the insurance in question being obtained on a mutual and co-operative

plan, whereby the parties insured agreed together, in order to get cheaper insurance, to insure each other at a fixed rate below the regular market rates for the same insurance by standard companies, good faith between the parties required the disclosure between themselves of everything involved in the plan, and concealment or conduct which induced a false impression on a material matter to remain fixed in the minds of the common agent, should, in the view of equity at least, avoid the policies or prevent their enforcement. The complainant would not, in such case, be making his demand with clean hands. In the present case it is insisted that the complainant does not so make it—answers to material questions having been withheld and rates having been accepted and taken advantage of which the insured did, but the insurers did not, know were lower than by agreement the plan of co-operative insurance in which they engaged provided for.

We do not think the defendants have made good this defense. We do not say that the legal theory on which it is based is inadmissible. We can easily suppose a plan of co-operative insurance resembling that involved here, in which the relations of the insured to each other are such that the mere failure to report to the common agent the rates at which a participant can obtain his other insurance, even if no questions are asked, might show such a want of good faith and such an attempt at overreaching as to prevent his recovering in equity the amounts for which he is nominally insured. But for several reasons we do not think the present such a case.

In the first place, the assumption contained in the argument advanced by defendants, that it was a part of the "plan of insurance" that the rate charged by them was to be in every case fifteen per cent. less than the rate at which the members' other insurance was written, is not borne out by anything within the four corners of either the "agreement" which the various members sign in becoming participants in the "plan," nor in the policies which are issued to them. In the "agreement"

the purpose is only said to be "to maintain an office where policies of fire insurance may be underwritten for the firms, corporations and individuals who have executed or shall execute" the agreement. The "plan" to effectuate this purpose is then laid out. With other things it provides that among the "Manager's" duties shall be that of underwriting the subscribers' policies of insurance, "to make cancellations and changes in the amounts and conditions of the same, and to perform such other acts in relation to such policies as the subscribers could themselves do." There is nothing in the body of the agreement about the rate of premium, nor anything from which it could be inferred that it was not to be left to the discretion of the manager, who is made by the agreement the attorney and agent of the subscribers to transact all the insurance business of the association, under a "Committee," consisting of three or more subscribers selected by the members; the duties of which committee are simply to "supervise the business by adopting proper regulations for the government of the Manager."

Not in the contract, but after the signature, in an appended note, is this announcement:

"When a request for insurance is made the subscriber should inform the Manager what the insurance companies' rate then is, and also send two copies of his form. Where the insurance companies' rates vary, the highest prevailing rate is the one to be given."

It may be noted that in this announcement even there is nothing to show that a rule of fixing rates at a definite discount from the standard premiums is a part of the "plan" of insurance.

In the policies themselves there is in the contract, over the signatures of the contracting parties, nothing whatever concerning the manner in which the rate is to be determined. Definite amounts, in consideration of which the insurance is made, are named in the policies —$150 for the $20,000 policy and $75 for the $10,000, and nothing more is said therein concerning the pre-

miums. Upon the back of the policies appear the following indorsements, which, with the announcement heretofore quoted, furnish all that can be found in or on the contracts to furnish a foundation for the assertion that the "plan" necessarily included a definite rebate from current "regular" insurance rates:

"STANDARD FIRE INSURANCE POLICY NEW YORK AND OTHER STATES.

Expires June 15th, 1904.
Property: Stock:
Amount $10,000.00          Premium $75.00.
Assured: PARKHURST-DAVIS MER. Co.
                No. 8598.
    N. B. The Premium hereon is at the Insurance Companies' Rate, the Net Premium to be paid for the policy being $11.25 less than same.
                Issued by
THE MERCHANTS UNDERWRITERS
                at
    The Indemnity Exchange,
            Chicago.

William Williamson,
            Attorney and Manager.
R. M. Williamson,
            Deputy.

    It is important that the written portions of all policies covering the same property read exactly alike. If they do not, they should be made uniform at once."

In this indorsement everything is written or printed but the clause following "N. B.," which is stamped upon the policy with a rubber stamp, the figures $11.25 being inserted by a pen.

The indorsement on the other policy is this:

"No. 9339.

Expires October 27th, 1904.
Assured: PARKHURST-DAVIS MER. Co.
Property: Main Stock.
Amount $20,000.
Rate $75.

(The Insurance Com- ⎫ Premium ..........$150.00
    panies Rate).    ⎬ Allowance ........ 22.50
Net Rate $63.        ⎭ Net Prem. ........ 127.50

Issued by
THE MERCHANTS UNDERWRITERS at
  The Indemnity Exchange.
    William Williamson,
        Attorney and Manager,
    Royal M. Williamson,
          Deputy."

If we should even assume that these entitling indorsements on the back of the policy are made a part of the contract, it is easy to see how far they are from making any condition or stipulation which would stamp as a part of the co-operative plan of the "subscribers" an invariable rule that a definite rebate was to be made from a rate to be fixed by definite methods of inquiry or report.

If such an arrangement was an essential part of the "plan" of insurance, and neglect to furnish the means of carrying it out was to impute to those obtaining insurance such bad faith as to avoid the insurance nominally issued to them, it is strange that in the instruments themselves, which they were called on to sign, this should not have been explicitly set down. But not only is such a provision wanting, but another, and that the usual one in "Standard New York policies," concerning frauds, concealments and misrepresentations, is inserted. The insertion of this usual and "standard policy" clause, instead of one recognizing the alleged peculiar mutually confidential relations

of the parties, seems to us to furnish a second reason why we should hesitate to hold that in this case insured and insurer dealt less at arm's length than in ordinary cases of insurance. The clause is this:

"This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

"*Inclusio unius est exclusio alterius*" is a legal maxim we think applicable here. Having inserted this clause in the policy, the insurers must stand by it, and unless the alleged "fraud" or "concealment" come within its terms, they cannot avoid the policy on account of it. To make it applicable, either the failure to answer the questions of the manager as to other rates must be regarded as a "concealment" "of a material fact or circumstance concerning the insurance or the subject thereof," or it must have been "a fraud" "by the insured touching a matter relating to the insurance or the subject thereof."

It is strenuously urged by the complainant that it is neither, for if a concealment at all, it is not of a "material" fact, since the rate charged by other insurance companies does not affect the character of the risk, and it cannot be a "fraud" to neglect to answer questions when the insurer has in his own hands the power to cancel the policy if he does not get answers to such questions.

It would be hard, we think, to escape from the force of this position, even without reference to the facts of this particular case as shown in the evidence of these facts seem to us to remove all doubt on the question involved and to furnish a third reason for holding the contention of the defendants that there was "fraud or concealment" in this matter vitiating the insurance contracts, to be unfounded.

The material facts shown by the evidence to affect this matter are these: The first transactions between the parties were in 1901. A representative of the Merchants Underwriters and of its manager called on Mr. Davis, the president of the complainant corporation, in Topeka, in October of that year, and solicited them to take insurance in the company, which involved, of course, under the plan of the defendants, subscription also to the agreement. The rate at first named as the one which the Underwriters would accept was the Board rate less fifteen per cent., but Mr. Davis refused to allow them to write insurance on that basis, saying that more inducement would have to be given, whereupon the Underwriters' representative agreed to make a flat rate of seventy-five cents on the hundred dollars, which was at least ten cents less than the then existing board rate, and to make a rebate of fifteen per cent. from that. On this basis, after the insurer's representative had made a personal inspection of the risk, a policy for $20,000 was written like the one sued on.

In June, 1902, another policy for $10,000 was issued on the same risk at the same rate.

When the first policy was about to expire the Underwriters, by their manager, under date of October 13, 1902, sent, without application, another policy renewing the insurance for a year at the same rate. The latter, however, bore a postscript reading:

"P. S. If the rate at which our policy is written from which our allowance is shown, is not the amount of the highest rate now paid by you to any insurance company, kindly give us the correct rate. In that case you need not, however, return the policy."

No answer was made to this implied question as to rates, and no further demand made for an answer. On May 29, 1903, a similar letter (without a previous application) was written by Williamson, the manager of the Underwriters, enclosing a policy for $10,000 to renew the one expiring June 15, 1904. To this also was appended a postscript as follows:

"N. B. Kindly name your present rate as soon as convenient, in case our basis rate from which our allowance of fifteen per cent. is deducted does not conform as stated on the front of the policy. Where insurance is obtained at less than Board rates or at rates that vary, then in order that no misunderstanding may exist, the assured should name also the Board rate."

No answer was made to this by the complainant concerning Board rates or other insurance rates, and this policy was in force at the time of the loss.

Again, on October 13, 1903, another policy (in force at the time of the fire), renewing the $20,000 risk, was sent to complainant by Mr. Williamson, and the letter enclosing it contained the postscript:

"N. B. Kindly notify us as soon as convenient in case the Insurance Companies' rates have been changed from the figures shown on the policy. If all insurance is obtainable at less than Board rate, then in order that no misunderstanding may exist, the Board rate should also be named."

It is on the failure to answer these three postscripts, although the Board rate and the rates paid by the complainant for other insurance had varied and increased after October, 1901, that the charge is made that "fraud" and "concealment" has been practised by the complainant which avoided the policies.

We cannot so hold. Under the circumstances, we do not think that the complainant was bound to more care or frankness in laying the situation before the manager of the Underwriters, or before their co-subscribers, than it would have been had the "Underwriters" been a regular and independent insurance company in the same situation.

The original contract justified the defendant in error in assuming that the ordinary rule adopted for determining the premiums was not an invariable one, but gave way in special cases to other considerations. The postscripts to the various letters, in view of there being

no change in the risk, may have well seemed perfunctory only. At all events, when the implied inquiry in the postscript to the letter of October 13, 1902, was not in default of an answer pressed, and the policy enclosed in the letter was not cancelled, but continued, such a view on the part of complainant would not be unjustifiable. As pointed out by the Appellate Court in the Fourth District in Farmers Mutual Fire & Lightning Ins. Co. v. Lecroy, 91 Ill. App. 41, and many other cases, and so far as we know universally declared by text writers on insurance, a failure to answer a question clearly and unambiguously, or to answer at all in connection with taking a policy, is not sufficient to avoid the policy, for the insurer has the right to insist upon an unambiguous answer and to refuse or to cancel the policy if such an answer is not given. In the case at bar, moreover, we cannot see why it was not within the power of the insurers, before the loss, to have investigated and ascertained for themselves the facts. It seems rather late after the fire to press for answers which, if they were deemed material and controlling, should have been required before.

The third ground of defense is thus stated by the plaintiffs in error: "The appellee's action in settling with and releasing and forever discharging the wrongdoer and principal debtor, The Topeka Water Company and its receiver, J. W. O'Neill, thereby not only released the surety, the appellant association, from liability upon the said policies of insurance, but for a small consideration frittered away appellant's rights to be subrogated to the appellee's right of recovery against the said wrongdoer and principal debtor, The Topeka Water Company, and its receiver."

The contention, in other words, is, that the insured had a right of recovery for the damage occasioned by the fire against a person whose alleged misconduct or neglect caused it, that this placed the insurance company in the position of a surety for the wrongdoer, The Topeka Water Company, especially as the policies

contained this clause: "If the attorney" (*i. e.* the manager) "shall claim that the fire was caused by the act or neglect of any person or corporation, private or municipal, the attorney shall, on payment of the loss, be subrogated to the extent of such payment to all right of recovery by the insured for the loss resulting therefrom, and such right shall be assigned to the attorney by the insured on receiving payment."

The Topeka Water Company being thus the principal and the Merchants' Underwriters the surety, the complainant, it is said, without the authority or consent of the surety, released the principal on the payment of a comparatively small sum, and in consequence by operation of law released the principal.

This was an affirmative defense, the burden of proving which was upon the defendants. They must prove first that the claim against the third party, which would place the insurers in the position of sureties, existed, and, secondly, that the complainant, without consent of the sureties, released that claim. In our opinion they did neither, and this relieves us of the necessity of considering the other reasons urged by the complainant against this third contention of the defendants.

The fact that the complainant, under the encouragement of the insurance companies brought a suit against the Topeka Water Company for the damage suffered by the fire does not prove that the claim existed; nor does the fact that the receiver of the Topeka Water Company bought his peace for a payment of a comparatively small sum. If, as applied to the circumstances of this case, the opposite doctrine is properly to be gathered from cases cited from other jurisdictions by plaintiffs in error, which, for reasons we have not space or time to set forth here, we doubt, we must decline to follow them. In this case we think the evidence bearing on the actual existence of the claim was properly admitted, and we think the preponderance of evidence was against the liability of the Water Com-

pany. But further insistence or discussion on this point would be useless, for we have no doubt whatever on the other necessary branch of this defense. The proof not only, in our opinion, fails to show that the complainant released this alleged claim without the authority and consent of the plaintiffs in error, it affirmatively shows the contrary. We do not intend to discuss the evidence on this point at length. It is sufficient to say that we think that the counsel who as attorneys for the "insurance companies" signed the agreement of April 21, 1904, between those companies and The Parkhurst-Davis Mercantile Company, and afterwards, on January 25, 1905, signed the stipulation for the dismissal of the petition against the receiver of the Topeka Water Company, just as much represented the "insurance companies" in one case as the other, and just as much represented and were authorized to represent the Merchants Underwriters as any other of the companies that joined hands at the meeting of March 17, 1904. If the insurers pay, they will be subrogated to their due proportion of the amount which was received in settlement by those attorneys. This is all they can justly claim.

And we think, although in view of our very definite opinion on the participation of the plaintiffs in error in the litigation against the Topeka Water Company, it is unnecessary to enlarge on it, that the doctrine of Fire Insurance Co. v. Packham, 92 Md. 464, is correct, that non-participation in such an action, if opportunity to become participants was given and refused, would not furnish ground for complaint of a settlement made in good faith and with reasonable judgment, if of the results of that settlement the insured stood ready to pay its proportionate share to the non-participants.

We have discussed all the essential points of the defense. They do not seem to us well taken. We do not think there was proof which fixed $450, or any other definite sum, as due from the defendant in error to the

plaintiffs in error on the underwriting account. Its non-allowance, therefore, as a credit was not an error.

We do not think that the decree of the Superior Court was based on errors in law or failed to do justice between the parties, and it is affirmed.

*Affirmed.*